09-1051-cr
United States v. al Kassar

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2010

(Argued: February 7, 2011    Decided: September 21, 2011)

Docket Nos. 09-1051-cr(L); 09-1057-cr(Con); 09-3972-cr(Con)

- - - - - - - - - - - - - - - - - - - - -x

**UNITED STATES OF AMERICA,**

     **Appellee,**

     **-v.-**                                          **09-1051-cr**

**MONZER AL KASSAR a/k/a ABU MUNAWAR a/k/a
EL TAOUS, LUIS FELIPE MORENO GODOY, TAREQ
MOUSA AL GHAZI,**

     **Defendants-Appellants.**

- - - - - - - - - - - - - - - - - - - - -x

Before:       DENNIS JACOBS, <u>Chief Judge</u>,
                PETER W. HALL, <u>Circuit Judge</u>,
                SHIRA A. SCHEINDLIN, <u>District Judge</u>.[*]

Appeals by three defendants from their criminal convictions, following jury trials in the United States District Court for the Southern District of New York

---

[*] The Honorable Shira A. Scheindlin, of the United States District Court for the Southern District of New York, sitting by designation.

(Rakoff, J.), for conspiring to kill U.S. officers, to acquire and export anti-aircraft missiles, and to provide material support to a known terrorist organization. Two defendants were additionally convicted of money laundering and conspiring to kill U.S. citizens. Defendants argue on appeal that federal subject-matter jurisdiction is lacking, that their due process rights were violated, that exculpatory evidence was improperly excluded, and that the evidence of a conspiracy among them was legally insufficient. As to the conviction for conspiring to acquire and export anti-aircraft missiles, defendants argue that the statute does not criminalize conspiracy, that the jury was improperly instructed on the statute's scienter requirements, and that the defendants' conduct falls within the statute's exception for conduct authorized by the U.S. government. As to the conviction for conspiring to knowingly support a terrorist organization, defendants argue that the statute violates due process by not requiring that the support be intended to further specifically criminal activities.

Affirmed.

FOR APPELLANTS:     Roger Lee Stavis
                    Gallet Dreyer & Berkey LLP
                    New York, NY
                    (for Monzer al Kassar and Luis Felipe
                    Moreno Godoy)

                    Marc Antony Agnifilo
                    Brafman & Associates
                    New York, NY
                    (for Tareq Mousa al Ghazi)

FOR APPELLEE:       Brendan R. McGuire
                    (Boyd M. Johnson III, Jesse M. Furman, *on
                    brief*)
                    On Behalf of Preet Bharara
                    U.S. Attorney's Office,
                    Southern District of New York
                    New York, NY

DENNIS JACOBS, <u>Chief Judge</u>:

Defendants Monzer al Kassar, Luis Felipe Moreno Godoy, and Tareq Mousa al Ghazi appeal their criminal convictions, entered after jury trials in the United States District Court for the Southern District of New York (Rakoff, J.), for conspiring to kill U.S. officers, to acquire and export anti-aircraft missiles, and to knowingly provide material support to a terrorist organization. Al Kassar and Godoy were also convicted of conspiring to kill U.S. citizens and of money laundering. Defendants argue on appeal that federal subject-matter jurisdiction is lacking, that their due process rights were violated, that exculpatory evidence

3

was excluded, and that the evidence of a conspiracy among them was legally insufficient. As to the conviction for conspiring to acquire and export anti-aircraft missiles, defendants argue that the statute does not criminalize conspiracy, that the jury was improperly instructed on the statute's scienter requirements, and that the defendants' conduct falls within the statute's exception for conduct authorized by the U.S. government. As to the conviction for conspiring to knowingly support a terrorist organization, defendants argue that the statute violates due process by not requiring that the support be intended to further specifically criminal activities.

Affirmed.

**BACKGROUND**

Since the 1970s, the U.S. government has suspected Monzer al Kassar, a Spanish national and resident, of illegal arms trafficking. United States v. al Kassar, 582 F. Supp. 2d 488, 491 (S.D.N.Y. 2008) ("Al Kassar I"). In 2005, the Drug Enforcement Administration ("DEA") set up a sting operation to apprehend him for selling arms illegally.

4

To this end, the DEA sent Samir Houchaimi, a confidential informant, to locate Tareq Mousa al Ghazi, a known associate of al Kassar, and set up a meeting with al Kassar. Houchaimi went to Lebanon, where al Ghazi lived, and won his trust over several months. Houchaimi told al Ghazi that he was in the weapons trade, asked to meet with al Kassar, and gave al Ghazi a fake end-user certificate[1] for Nicaragua supplied by the DEA. Houchaimi asked al Ghazi to arrange a meeting with al Kassar, and al Ghazi agreed.

Al Kassar arrived at the arranged meeting in Beirut holding the end-user certificate Houchaimi had given to al Ghazi. The meeting was fruitful, ending with al Kassar inviting Houchaimi to his mansion in Spain to further discuss the Nicaraguan arms deal.

At the meeting in Spain (in February 2007), Houchaimi introduced al Kassar to "Carlos" and "Luis"--two undercover DEA agents posing as members of FARC (a left-wing Colombian terrorist organization)--and al Kassar introduced his associate, Luis Felipe Moreno Godoy. The DEA agents told al Kassar they were interested in buying weapons for FARC's use

---

[1] An end-user certificate is an official government document authorizing a sale of particular weapons to a particular end-user. It is required to conduct a legal international weapons sale.

against the U.S. military in Colombia.  They gave al Kassar a list of weapons they wanted, which included anti-aircraft missiles ("SAMs").  Al Kassar agreed to negotiate.

Over the next several months, in the presence of Godoy and al Ghazi, al Kassar negotiated an arms deal with the two DEA agents.[2]  The negotiators discussed at length FARC's intent to use the weapons against Americans and U.S. assets.  When al Kassar left the room during a break in negotiations, al Ghazi advised the DEA agents how to negotiate effectively with al Kassar.  At the end of March, 2007, when the parties had agreed to basic terms (including the sale of SAMs), Godoy took the DEA agents to an Internet café and helped them transfer a down payment (€100,000) to a bank account controlled by al Kassar.

The next day (after confirming receipt of the down payment), al Kassar again met with the DEA agents to discuss details.  Before the meeting, al Ghazi again counseled the DEA agents on how best to secure the sale.  At the meeting-- again in the presence of Godoy and al Ghazi--al Kassar gave the DEA agents schematics for the SAMs he was selling and

---

[2] The negotiations were conducted primarily in Spanish, but al Kassar translated for al Ghazi and Houchaimi.  Many of the meetings were secretly recorded by Houchaimi.

explained how he planned to smuggle the weapons into Colombia through a cargo ship destined for Suriname (with al Kassar, as usual, translating for al Ghazi).

In May 2007, al Kassar and Godoy facilitated a meeting between the DEA agents and the captain of the ship that would smuggle the weapons. Before the meeting, the DEA agents wired another payment ($135,000) to a bank account controlled by al Kassar. Afterward, al Kassar and Godoy visited arms factories in Bulgaria and Romania to secure the weapons.

In June 2007, the DEA agents agreed to meet al Kassar and Godoy in Bucharest to make final payment. Al Kassar stayed in Spain, however, and sent Godoy and al Ghazi to pick up the money. Pursuant to valid arrest warrants and in coordination with the DEA, Romanian authorities arrested al Ghazi and Godoy in Bucharest. The same day, Spanish authorities arrested al Kassar at the Madrid International Airport; he was carrying fake end-user certificates for the FARC weapons and documents confirming final arrangements to ship the weapons from Romania to Suriname. A search of al Kassar's mansion yielded documents establishing his and Godoy's participation in other arms deals and confirming

that al Kassar controlled the bank accounts into which the DEA agents had wired money.

Godoy and al Ghazi were extradited here from Romania in October 2007.  During the flight, al Ghazi agreed to waive his Miranda rights and admitted to the DEA agents that:  (1) he knew al Kassar was selling weapons, including SAMs, to FARC; (2) he knew that FARC was a terrorist organization, which planned to use the weapons to kill Americans; and (3) he facilitated the deal because he was promised a €125,000 commission.  In June 2008, al Kassar was extradited here from Spain.

Once in the United States, the defendants were indicted on four counts:

[1] Conspiracy to kill U.S. citizens in violation of 18 U.S.C. § 2332(b).

[2] Conspiracy to kill U.S. officers and/or employees in violation of 18 U.S.C. §§ 1114, 1117.

[3] Conspiracy to acquire and export SAMs in violation of 18 U.S.C. § 2332g.

[4] Conspiracy to provide material support to a known terrorist organization in violation of 18 U.S.C. § 2339B.

Al Kassar and Godoy were also indicted on a fifth count:

[5] Money laundering in violation of 18 U.S.C. § 1956.

The district court denied defendants' motion to dismiss the indictments for violation of due process. Al Kassar I, 582 F. Supp. 2d at 498. The district court likewise denied their motions (after hearings) to admit classified information related to prior and contemporaneous interactions with Spanish intelligence agents, allegedly for the benefit of the United States. United States v. Al Kassar, 582 F. Supp. 2d 498, 500 (S.D.N.Y. 2008) ("Al Kassar II"). The district court concluded that the proffered classified information was irrelevant, needlessly confusing, or inadmissible prior acts evidence. Fed. R. Evid. 402-405.

Al Ghazi's trial was severed when he was hospitalized a week before the scheduled trial. Al Kassar and Godoy were convicted by a jury on all five counts. Al Ghazi was tried several months later and convicted of conspiring to kill U.S. officials, to acquire and export SAMs, and to provide material support to a known terrorist organization. Al Ghazi was acquitted of conspiring to kill U.S. citizens. Al Kassar and Godoy were sentenced in February 2009 to 30 years and 25 years respectively. Al Ghazi was sentenced in July 2009 to 25 years.

The defendants timely appealed their convictions, but do not contest the sentences.

## DISCUSSION

On appeal, the defendants challenge their convictions on the following grounds:

[I]     The government lacked jurisdiction to prosecute because of an insufficient nexus between their actions and the United States.

[II]    The government's investigation constituted "outrageous conduct" in violation of their due process rights.

[III]   The district court erred in denying their motion to introduce exculpatory classified evidence.

[IV]    The convictions under 18 U.S.C. § 2332g (acquiring and exporting SAMs) must be overturned because: the statute does not criminalize conspiracy; the jury was improperly instructed as to scienter; the defendants' actions fall under the statute's exception for authorized conduct; and there was insufficient evidence of conspiracy.

[V]     The convictions under 18 U.S.C. § 2339B (aiding a known terrorist organization) must be overturned because: the statute requires that the aid be intended to support the illegal activities of the terrorist organization, or, in the alternative, the statute violates the Fifth Amendment's Due Process Clause by not requiring such intent.

Al Ghazi challenges his conviction on a sixth ground:

[VI]    There was insufficient evidence he conspired with al Kassar or Godoy to kill U.S. officers and materially aid a known terrorist organization.

The Sections in this opinion correspond to these arguments.

                                    I

The defendants argue that federal subject-matter jurisdiction is lacking because:  First, there is an insufficient nexus between their conduct and the United States for U.S. law to apply to them; second, any nexus that does exist was created by the DEA agents, not the defendants.

                                    A

In a challenge to subject-matter jurisdiction, we review a district court's factual findings for clear error and its legal conclusions de novo.  APWU v. Potter, 343 F.3d 619, 623-24 (2d Cir. 2003).  "[A]s a general proposition, Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'"  United States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003) (quoting EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991)).  The

11

presumption that ordinary acts of Congress do not apply extraterritorially, see Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 173 (1993), does not apply to criminal statutes. United States v. Bowman, 260 U.S. 94, 98 (1922); see also Yousef, 327 F.3d at 86. When the text of a criminal statute is silent, Congressional intent to apply the statute extraterritorially must "be inferred from the nature of the offense." Bowman, 260 U.S. at 98.

Four of the five counts on which the defendants were convicted--conspiracy to kill U.S. nationals, conspiracy to acquire and export SAMs, conspiracy to aid a known terrorist organization, and money laundering--contain explicit provisions applying them extraterritorially. See 18 U.S.C. § 2332(b); id. § 2332g(b); id. § 2339B(d); id. § 1956(b)(2). Although the conspiracy to kill U.S. officers or employees count, id. §§ 1114, 1117, contains no explicit extraterritoriality provision, the nature of the offense-- protecting U.S. personnel from harm when acting in their official capacity--implies an intent that it apply outside of the United States. The provision protects U.S. employees, and a significant number of those employees perform their duties outside U.S. territory. District

12

courts in our Circuit have applied it so, as have courts in other circuits. See, e.g., United States v. Benitez, 741 F.2d 1312, 1317 (7th Cir. 1984) (applying §§ 1114, 1117 extraterritorially); United States v. Bin Laden, 92 F. Supp. 2d 189, 202 (S.D.N.Y. 2000) (applying § 1114 extraterritorially). We join them and conclude that §§ 1114 and 1117 apply extraterritorially.

When Congress so intends, we apply a statute extraterritorially as long as doing so does not violate due process. Yousef, 327 F.3d at 86. "'In order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair.'" Id. at 111 (quoting United States v. Davis, 905 F.2d 245, 248-49 (9th Cir. 1990)). For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests. See United States v. Peterson, 812 F.2d 486, 494 (9th Cir. 1987) ("Protective jurisdiction is proper if the activity threatens the

security or government functions of the United States.");
see also Yousef, 327 F.3d at 112; Davis, 905 F.2d at 249.

The defendants' conspiracy was to sell arms to FARC with the understanding that they would be used to kill Americans and destroy U.S. property; the aim therefore was to harm U.S. citizens and interests and to threaten the security of the United States. The defendants observe that this Court has never before found a sufficient jurisdictional nexus based on a sting operation taking place entirely outside the United States and involving solely foreign citizens. But the geographical location of an undercover investigation is irrelevant to the sufficiency of the jurisdictional nexus. If an undercover operation exposes criminal activity that targets U.S. citizens or interests or threatens the security or government functions of the United States, a sufficient jurisdictional nexus exists notwithstanding that the investigation took place abroad and focused only on foreign persons.

The defendants argue that, even if these U.S. laws apply to them in theory, in practice such application is "fundamentally unfair" because their conduct was so far removed from any U.S. interest or person. True, the

14

defendants' conduct never came close to harming any U.S. person or property, but this is irrelevant for conspiracy offenses, which often result in no palpable harm. Jurisdictional nexus is determined by the aims of the conspiracy, not by its effects.

Finally, the defendants argue that, nexus aside, U.S. jurisdiction is fundamentally unfair because they lacked fair warning that their conduct exposed them to U.S. criminal prosecution.  We disagree.  The idea of fair warning is that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."  Bourie v. City of Columbia, 378 U.S. 347, 351 (1964) (internal quotation marks omitted).  Fair warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere.  The defendants were not ensnared by a trap laid for the unwary.  Supplying weapons illegally (i.e., without legitimate end-user certificates) to a known terrorist organization with the understanding that those weapons would be used to kill U.S. citizens and destroy U.S.

15

property is self-evidently criminal; and their deliberate attempts to avoid detection suggested the defendants so understood.

**B**

In the alternative, the defendants argue that any jurisdictional nexus was created entirely by acts of the DEA agents who "manufactured" jurisdiction over the defendants in violation of due process.

"[T]he 'manufactured jurisdiction' concept is properly understood not as an independent defense," but as a collection of three distinct defense theories: (1) outrageous government conduct in violation of due process; (2) entrapment; and (3) a failure by the prosecution to prove an essential element of the crime. United States v. Wallace, 85 F.3d 1063, 1065-66 (2d Cir. 1996). The defendants raise the outrageous conduct defense as an independent basis for overturning their convictions, and it is discussed in Section II. Here, we reject the entrapment and unproven-element theories.

16

**1**

Since each defendant's entrapment argument was rejected by a jury, no defendant can prevail on appeal unless he was entrapped as a matter of law, i.e., he has proven that: (1) the government originated the criminal design, (2) the government suggested the design to the defendant and induced him to adopt it, and (3) the defendant had no predisposition to engage in the criminal design prior to the government's inducement.  Jacobson v. United States, 503 U.S. 540, 548-49 (1992); United States v. Rahman, 189 F.3d 88, 131 n.16 (2d Cir. 1999).

It is uncontested that the government originated the illegal arms deal and induced the defendants' participation with money and political ideology.  However, it cannot be said as a matter of law that the defendants lacked a predisposition to conspire to illegally sell arms to known terrorists.  The defendants' knowledge of how to procure and smuggle arms suggests experience in the trade; and their positive reaction to the idea that the arms would be used to kill Americans and harm U.S. interests suggests a predisposition to support and participate in that goal.  A reasonable jury thus could have concluded that the

defendants were predisposed to commit the crimes for which they were convicted. This may have been a close call, especially with respect to al Ghazi, but it was a call for the jury to make.

**2**

The unproved-element theory of manufactured jurisdiction is that if the government unilaterally supplies an essential element of a crime, the government has in effect failed to prove that element as to the defendant. See generally United States v. Archer, 486 F.2d 670 (2d Cir. 1973). In Archer, the case that originated this theory, undercover federal agents sought to transform a state crime into a federal offense by having the defendant participate in a call which, without his knowing, was interstate. Id. at 672-74. In the years since Archer, we have limited it. See, e.g., Wallace, 85 F.3d at 1065; United States v. Keats, 937 F.2d 58, 64-65 (2d Cir. 1991). Now, even if the government initiates an essential element of a crime, jurisdiction is not manufactured if the defendant "then takes voluntary actions that implicate the [government-initiated] element." Wallace, 85 F.3d at 1066.

18

Here, the DEA agents initiated an arms transaction with the defendants by posing as terrorists and requesting SAMs (and other weapons) from the defendants for use in killing Americans. But the defendants responded to this request by conspiring among themselves to acquire and sell these weapons to what they believed was a terrorist organization with knowledge that the weapons would be used to kill Americans. Creating an opportunity for a defendant to engage in criminal conduct does not violate the Constitution and does not constitute a "manufacture" of jurisdiction--or of any of the elements required to obtain a conviction for that criminal conduct. See United States v. Schmidt, 105 F.3d 82, 91-92 (2d Cir. 1997). The government did not manufacture jurisdiction because every element of the crimes of conviction was established by evidence of voluntary action by the defendants.

The defendants contend that the DEA agents created the jurisdictional nexus with the United States by injecting the notion that the weapons were going to FARC for use against Americans. While it is true the DEA agents lied to the defendants, this does not make the nexus artificial or invalid. Sting operations, by nature, involve lies told to

19

the target.  The defendants were convicted of conspiring to sell SAMs to what they believed was a terrorist organization for use against Americans, and that is what they conspired to do.  That their conspiracy was never going to succeed is irrelevant. (It is to be hoped that all such schemes are foredoomed one way or another.)

For these reasons, we conclude that the United States has jurisdiction to prosecute the defendants.

## II

The defendants argue that the DEA agents' pervasive involvement in the weapons deal amounted to outrageous government conduct violative of their rights to due process under the Fifth Amendment.  They also argue that the district court erred by not holding a hearing on this issue.

### A

Whether to dismiss an indictment for outrageous government conduct is a legal question, which we review de novo.  United States v. Cuervelo, 949 F.2d 559, 567 (2d Cir. 1991).  Government involvement in a crime may in theory become so excessive that it violates due process and

20

requires the dismissal of charges against a defendant even if the defendant was not entrapped.  Rahman, 189 F.3d at 131; see also United States v. Russell, 411 U.S. 423, 431-32 (1973) ("[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.").  But see Hampton v. United States, 425 U.S. 484, 490 (1976) (plurality) ("If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law.").  Unlike entrapment, which focuses on the defendant's predisposition, outrageous government conduct focuses on the conduct of the government agents.  United States v. Myers, 692 F.2d 823, 836 (2d Cir. 1982).

To establish a due process violation on this ground, a defendant must show that the government's conduct is "so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction."  Schmidt, 105 F.3d at 91; see also Rahman, 189

21

F.3d at 131 (government action must shock the conscience to sustain a due process violation); <u>United States v. LaPorta</u>, 46 F.3d 152, 160 (2d Cir. 1994) (government action must "reach a demonstrable level of outrageousness before it could bar conviction" (internal quotation marks omitted)). This is a "very heavy" burden in light of our "well-established deference to the Government's choice of investigatory methods." <u>Rahman</u>, 189 F.3d at 131. Generally, to be "outrageous," the government's involvement in a crime must involve either coercion or a violation of the defendant's person. <u>Schmidt</u>, 105 F.3d at 91; <u>Myers</u>, 692 F.2d at 837. It does not suffice to show that the government created the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive. <u>Schmidt</u>, 105 F.3d at 91; <u>Myers</u>, 692 F.3d at 837. Likewise, feigned friendship, cash inducement, and coaching in how to commit the crime do not constitute outrageous conduct. <u>Myers</u>, 692 F.2d at 837-39.

The defendants allege no coercion, intimidation, or physical force by the DEA agents. Instead, they argue that the following facts amount to outrageous government conduct: (1) no conspiracy existed among the defendants prior to the

government's request for weapons, (2) the government "lured" the defendants into the illegal arms deal by first offering an arms deal that was legal, and by befriending al Ghazi and winning his trust over a long period, (3) al Ghazi exhibited some hesitation and apprehension about the illegal weapons deal, (4) the government involved the defendants in a wide variety of illegal activities, and (5) the government induced the crimes using political rhetoric and money.

None of these actions, either separately or in combination, rises to the legal standard of outrageous. First, the absence of a conspiracy prior to government involvement shows only that the government created the opportunity for illegal conduct. See LaPorta, 46 F.3d at 154-55, 160-61 (finding no due process violation where defendant was convicted of arson for fire he set only after an undercover agent asked him to); Schmidt, 105 F.3d at 92 (creation of opportunity to commit a crime is not outrageous government conduct); Myers, 692 F.2d at 837 (same). Second, neither the lawful arms proposal nor the winning of trust renders the government's involvement coercive or outrageous; these are commonplace and often necessary tactics for infiltrating criminal enterprises. Third, transient

hesitation provides no basis for an excessive involvement claim unless the government coerces the defendant, and no coercion was applied here. Myers, 692 F.2d at 837-39. Fourth, the large number of laws violated by the arms deal is irrelevant to whether the government's involvement was excessive; if anything, it further supports the inference that the defendants had notice that their conduct was illegal. Fifth, financial and ideological inducements are not outrageous conduct. See id. at 837-38 (even extremely large financial inducements do not rise to the level of due process violations).

While the sting operation in this case was elaborate and prolonged, there was no coercion or physical force, and nothing done was outrageous or a shock to the conscience.

**B**

The defendants argue that the district court improperly denied them a pre-trial hearing on their jurisdictional and due process defenses. They cite Cuervelo for the proposition that in the context of such defenses, "[m]ost often, conducting a hearing is the preferred course of action in cases where disputed factual issues exist." 949

24

F.2d at 567. However, "[n]othing in Cuervelo requires a district court to conduct a hearing every time a defendant alleges outrageous government misconduct." LaPorta, 46 F.3d at 160. Where, as here, there are no material facts in dispute related to the alleged government misconduct, no hearing is necessary. Id. We therefore conclude that the district court did not err in denying the defendants' motion for a hearing on these issues.

**III**

The defendants challenge their convictions on the further ground that the district court improperly refused to admit classified evidence relating to past and contemporaneous contact between the defendants and Spanish intelligence officials, allegedly for the benefit of the United States. In a written opinion, the district court ruled that the evidence of past contacts was irrelevant and confusing under Federal Rules of Evidence 401 and 403, and amounted to inadmissible prior acts evidence under Federal Rules of Evidence 404 and 405. Al Kassar II, 582 F. Supp. 2d at 500. The district court excluded the defendants' subsequent proffer of evidence relating to contemporaneous

contacts with Spanish intelligence on similar grounds, reasoning that its potential for confusion vastly outweighed any probative value.  The defendants argue that these rulings denied them their constitutional right to present a complete defense, and also constituted legal error under the Federal Rules of Evidence.  We reject both contentions.

**A**

Criminal defendants are "entitled by the Constitution to a meaningful opportunity to present a complete defense." Wade v. Mantello, 333 F.3d 51, 57 (2d Cir. 2003); see also Clark v. Arizona, 548 U.S. 735, 769 (2006) (holding that the right to present a complete defense is "a matter of simple due process"); Taylor v. Illinois, 484 U.S. 400, 408 (1988) (holding that criminal defendants have the right to "put before a jury evidence that might influence the determination of guilt" (internal citations and quotation marks omitted)).  At the same time, this right is subject to "reasonable restrictions."  Wade, 333 F.3d at 58.  State and federal rules of evidence may restrict evidence "to assure both fairness and reliability in the ascertainment of guilt

26

and innocence." Id. (quoting Chambers v. Mississippi, 410 U.S. 284, 302 (1973)).

The defendants argue that the denial of their requests to offer the classified evidence prohibited them from arguing, by way of a defense, that they had no intention of completing the illegal arms deal. However, the defendants presented this exact defense at their trials. True, the excluded evidence might have marginally reinforced their defense; but because it was neither compelling nor integral to their defense theory, its exclusion does not amount to a constitutional violation.

**B**

Even if the exclusion of their proffered evidence did not amount to a constitutional violation, defendants argue that it was legal error. Construing their argument as a challenge to the district court's evidentiary ruling, we review it for abuse of discretion, reversing only if we find manifest error. United States v. Miller, 626 F.3d 682, 687–88 (2d Cir. 2010). Rule 403 determinations command especial deference because the district court is in "the best position to do the balancing mandated by Rule 403." United

States v. Stewart, 590 F.3d 93, 133 (2d Cir. 2009) (internal quotation marks omitted).  So long as the trial court "conscientiously balanced the proffered evidence's probative value with the risk for prejudice," we will reverse its conclusion "only if it is arbitrary or irrational."  United States v. Awadallah, 436 F.3d 125, 131 (2d Cir. 2006).  Even manifest error does not require reversal if the error was harmless, Miller, 626 F.3d at 687-88, that is, if we can conclude with fair assurance that the evidence would not have substantially influenced the jury.  United States v. Jackson, 301 F.3d 59, 65 (2d Cir. 2002).  We see no reversible error.

The vast majority of the classified evidence proffered by the defendants does not relate to the particular conspiracies for which they were convicted.  Instead, it consists of prior good acts performed by the defendants allegedly for the good of the United States; thus, it constitutes prior act evidence used to "prove the character of a person in order to show action in conformity therewith."  Fed. R. Evid. 404(b).  Such prior act evidence is inadmissible under Federal Rule of Evidence 404(b) for

that purpose, id., as the district court properly concluded. Al Kassar II, 582 F. Supp. 2d at 500.

Nor is the evidence admissible as proof of habit under Rule 406, as the district court also properly concluded. Id. at 501. A habit is "semi-automatic"--it involves a "person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time." Fed. R. Evid. 406 (1972 Proposed Rules). The defendants' prior acts are not habitual in that way (or any other way), nor would the few isolated prior acts proffered by the defendants constitute a habit even if they were. U.S. Football League v. Nat. Football League, 842 F.2d 1335, 1373 (2d Cir. 1988) (three or four prior acts over a long period are not sufficient to establish a habit).

The district court also excluded the proffered evidence under Rule 403, finding that any minimal probative value of the prior acts was outweighed by the likelihood of jury confusion. Al Kassar II, 582 F. Supp. 2d at 500. This was not manifest error. Leaving aside the defendants' mischaracterization of the proffered evidence on appeal, its probative value was properly discounted, as most of it

29

related to wholly different events that took place many years earlier and "would require a trial within a trial before the jury could determine whether there was any meaningful analogy at all." Id.[3] And the trial judge was rightly concerned that, to the extent any of the evidence could be construed to relate to the charged conspiracies, the jury would find it extremely confusing, if not incomprehensible.

Because we conclude that the defendants' proffered evidence is inadmissible under Rule 404 and that the district court did not commit manifest error by excluding it under Rule 403, we reject the defendants' evidentiary challenge to the exclusion.

**IV**

The defendants challenge their convictions for conspiring to acquire and export SAMs in violation of 18 U.S.C. § 2332g on four grounds: [A] their conduct was not

---

[3] The defendants argue on appeal that, in a case charging conspiracy to kill United States nationals, officers, and employees, the district court's evidentiary rulings "prevented [the defendants] from countering [the Government's] one-sided, biased version of the facts." This argument was not made to the district court. We express no view whether, had defendants made this argument, the evidence would have been admissible on this theory.

30

illegal under § 2332g because the statute does not criminalize conspiracy; [B] their conduct was not illegal under § 2332g because it was authorized by an agency of the United States; [C] the statute's scienter requirement was improperly omitted from the jury instruction; and [D] the evidence was legally insufficient to convict them.

**A**

The defendants contend that 18 U.S.C. § 2332g does not criminalize conspiracy. We review <u>de novo</u> questions of statutory interpretation. <u>L-3 Commc'ns Corp. v. OSI Sys., Inc.</u>, 607 F.3d 24, 27 (2d Cir. 2010).

The relevant wording of § 2332g states:

> (a)Unlawful Conduct. . . . it shall be unlawful for any person to knowingly produce, construct, otherwise acquire, transfer directly or indirectly, receive, possess, import, export, or use, or possess and threaten to use [SAMs].
>
> . . .
>
> (c) Criminal Penalties. . . . Any person who violates, or attempts or *conspires* to violate, subsection (a) shall be fined not more than $2,000,000 and shall be sentenced to a term of imprisonment not less than 25 years or to imprisonment for life.

18 U.S.C. § 2332g(a), (c) (emphasis added). The plain text of subsection (c) penalizes conspiring to acquire and export

SAMs.  The defendants argue, however, that the conspiracy language does not appear under the "unlawful conduct" heading, so that the statute does not make conspiring unlawful.  This reading isolates the unlawful conduct section of the statute from the rest of the act, and it renders the conspiracy language in the "criminal penalties" section not just superfluous but self-refuting; in this way the defendants' reading violates two canons of interpretation:  we read statutes as a whole, with no section interpreted "in isolation from the context of the whole Act," United States v. Kozeny, 541 F.3d 166, 171 (2d Cir. 2008) (internal quotation marks omitted); and we interpret statutes "to give effect, if possible, to every clause and word," Duncan v. Walker, 533 U.S. 167, 174 (2001), and to "avoid statutory interpretations that render provisions superfluous." United States v. Anderson, 15 F.3d 278, 283 (2d Cir. 1994).

More broadly, we interpret statutes "to give effect to congressional purpose." Johnson v. United States, 529 U.S. 694, 710 n.10 (2000).  The text of the Intelligence Reform and Terrorism Prevention Act of 2004 states that the purpose of what is now § 2332g is "to combat the *potential* use of

32

weapons that have the ability to cause widespread harm to United States persons and the United States economy . . . and to threaten or harm the national security or foreign relations of the United States." Pub. L. No. 108-458, Title VI, § 6902, 118 Stat. 3638, 3769-70 (2004) (emphasis added). The defendants' interpretation of the statute would undermine this purpose; in contrast, our interpretation-- that the statute criminalizes conspiracies to acquire SAMs-- furthers this purpose of combating the *potential* use of these weapons. We conclude that 18 U.S.C. § 2332g criminalizes conspiracies to acquire and export SAMs.

**B**

The defendants argue that their conspiracy to acquire and export SAMs constituted action authorized by the United States under 18 U.S.C. § 2332g(a)(3) because it was done under the guidance and inspiration of the DEA agents. We disagree.

Again, we review de novo questions of statutory interpretation. L-3 Commc'ns Corp., 607 F.3d at 27. The defendants rely on the exclusion of government conduct from the general prohibition of 18 U.S.C. § 2332g:

33

> Th[e prohibition on acquiring and exporting SAMs] does not apply with respect to . . . conduct by or under the authority of the United States or any department or agency thereof or of a State or any department or agency thereof; or conduct pursuant to the terms of a contract with the United States or any department or agency thereof or with a State or any department or agency thereof.

18 U.S.C. § 2332g(a)(3). The defendants argue that (though they didn't know it) the DEA authorized their conduct when its agents asked the defendants to sell them SAMs. As the defendants concede, this interpretation would effectively foreclose sting operations as an enforcement technique; but they argue that Congress uses an express "sting provision" in statutes if it intends that sting operations be allowed. See, e.g., 18 U.S.C. § 1956(a)(1) (criminalizing money laundering whenever the defendant *believed* the money involved resulted from unlawful activity even when the money was secretly lawfully procured through a sting operation).

Section 2332g (as we held, supra) criminalizes conspiracies to acquire and export SAMs. We decline to read the statute simultaneously to ban sub silentio one of the few effective ways for the government to combat such conspiracies. See United States v. Dauray, 215 F.3d 257, 264 (2d Cir. 2000) (holding that we interpret statutes to prevent absurd results).

34

Nor can it be said that a sting operation "authorizes" the criminal conduct it exposes.  The fact that undercover government agents support an illegal act as part of a sting operation does not "authorize" that act or otherwise make it legal.  The defendants' analogy to the federal money laundering statute is inapt; money laundering is a unique crime because it requires not only that the defendant believe the money involved is tainted by prior illegal activity, but also that the money *in fact be so tainted*.  It is this second requirement that necessitates the statute's explicit sting exception:  The exception is required not because a sting operation secretly authorizes a defendant's transactions involving illegally obtained money (it doesn't), but because the sting operation secretly uses money that was legally obtained.  18 U.S.C. § 2332g does not share this second requirement--it criminalizes unauthorized conduct related to *all* SAMs, not just those tainted by some prior criminal transaction--so there is no need for an explicit sting exception.  Similar statutes, which categorically criminalize the unauthorized acquisition and sale of a particular object (regardless of whether that object is tainted by prior illegal activity) have been read

35

to allow for detection by sting operations notwithstanding the absence of an explicit sting provision. See, e.g., United States v. Wallace, 532 F.3d 126, 127 (2d Cir. 2008) (affirming conviction for sale of cocaine to confidential informant under the Controlled Substance Act despite its exception for sales authorized by law and its lack of a sting provision).

We conclude that the acquisition and export of SAMs (or a conspiracy with that aim) at the behest of a government agent acting undercover does not constitute "conduct by or under the authority of the United States or any department or agency thereof" and is therefore criminalized by 18 U.S.C. § 2332g.

C

The defendants argue that the jury charge on the § 2332g conspiracy count erroneously omitted the scienter requirement for the underlying offense of acquiring and exporting SAMs. We disagree.

A jury instruction is erroneous if it "[misleads] the jury as to the correct legal standard or [does] not adequately inform the jury on the law." United States v.

Goldstein, 442 F.3d 777, 781 (2d Cir. 2006).  The defendants objected to the § 2332g jury instruction before the district court, but on different grounds from those they now advance on appeal, and the district court accommodated the defendants' first objection.  Because the defendants' present objection was not made before the district court, we review the instruction for plain error, reversing only where (1) the instruction was erroneous, (2) the error was plain (i.e., obvious), (3) the error prejudiced the defendants' substantial rights, and (4) that prejudice affected the fairness, integrity, or public reputation of the judicial proceeding.  United States v. Joyner, 313 F.3d 40, 45 (2d Cir. 2002); see also United States v. Johnson, 529 F.3d 493, 501-02 (2d Cir. 2008) (reserving plain error only for "those circumstances in which a miscarriage of justice would otherwise result" (internal quotation marks omitted)).  An erroneous instruction is prejudicial unless "it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error."  Goldstein, 442 F.3d at 781.

A conspiracy conviction under § 2332g requires two distinct findings as to scienter.  First, the defendant must

*intend* to agree to participate in the conspiracy (<u>i.e.</u>, it is not enough that the defendant participated unwittingly or joined under the mistaken impression that the conspiracy involved some other, legal activity).  See <u>United States v. Morgan</u>, 385 F.3d 196, 206 (2d Cir. 2004) ("Conspiracy is a specific intent crime:  To be guilty of conspiracy, there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the scheme alleged in the indictment and knowingly joined and participated in it." (internal quotation marks omitted)). Second (in this case), the *aim* of the conspiracy must be to "*knowingly* produce, . . . acquire, transfer, . . . receive, possess, import, export, . . . use, or possess and threaten to use [SAMs]" (<u>i.e.</u>, the conspirators cannot just happen to acquire an SAM while intending to acquire some other weapon or object).  18 U.S.C. § 2332g(a)(1) (emphasis added); <u>see also</u> <u>Ingram v. United States</u>, 360 U.S. 672, 678 (1959) ("Conspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself.") (internal quotation marks and alterations omitted).  To be accurate, a

38

jury instruction on a § 2332g conspiracy must convey both of these scienter requirements.

The district judge gave the following jury instruction:

> Count Three charges both defendants with conspiring to acquire and export antiaircraft missiles. In order to sustain its burden of proof with respect to this charge as to a given defendant, the government must prove beyond a reasonable doubt each of the two elements: First, the existence of the charged conspiracy, as further described below; and second, that the defendant you are considering intentionally joined and participated in the conspiracy during the applicable time period in order to further its unlawful purpose.
>
> . . .
>
> The conspiracy alleged in Count Three, however, is materially different from the conspiracies alleged in Counts One and Two. Specifically, in order to satisfy the first element of Count Three, the government must prove beyond a reasonable doubt that the purpose of the conspiracy was to acquire and export explosive or incendiary rockets or missiles guided by a system enabling the rockets or missiles to seek aircraft.

In reviewing a jury instruction, we "examine not only the specific language that the defendant challenges but also the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." United States v. Bala, 236 F.3d 87, 94-95 (2d Cir. 2000) (internal quotation marks omitted). A defendant "has no right to demand that required factual findings be stated in any

39

particular number of elements," and when an offense has ramified elements, a jury instruction need not separately delineate each element so long as "when viewed as a whole, [it] adequately instruct[s] the jury as to all factual findings required to support conviction." United States v. Quinones, 511 F.3d 289, 315 (2d Cir. 2007); see also United States v. Conway, 73 F.3d 975, 980 (2d Cir. 1995) ("[The] trial judge retains extensive discretion in tailoring jury instructions, provided that they correctly state the law and fairly and adequately cover the issues presented.").

The district court's jury instruction here included both scienter requirements, though they were not delineated as independent elements. As to the first, the instruction required the jury to find that the defendant "intentionally joined and participated in the conspiracy." As to the second, the instruction required the jury to find "that the purpose of the conspiracy was to acquire and export [SAMs]." This adequately conveyed the knowledge requirement for the underlying substantive offense; if the jury found that the defendants intentionally joined a conspiracy that had as a purpose to acquire and export SAMs, then the jury also found

that the defendants knew the purpose of that conspiracy was to acquire and export SAMs.

Viewed as a whole, the jury instruction "adequately instructed the jury as to all factual findings required to support conviction." Quinones, 511 F.3d at 315. Therefore, the instruction did not mislead the jury and was not erroneous, let alone plainly so.

**D**

Finally, the defendants argue that the evidence presented by the prosecution was legally insufficient to establish that they conspired with each other to acquire and export SAMs.

We review de novo challenges to criminal convictions based on insufficiency of evidence; however, in assessing the evidence, we apply the same deferential standard as the district court, viewing the evidence in the light most favorable to the government, drawing all reasonable inferences in the government's favor, and resolving all questions of credibility in the government's favor. United States v. Abu-Jihaad, 630 F.3d 102, 135 (2d Cir. 2010).

To overturn a conviction for insufficiency of the evidence, a defendant must establish that, after construing the evidence in the light most favorable to the prosecution, there is an element of the crime of conviction that no rational jury could have found beyond a reasonable doubt. United States v. Hassan, 578 F.3d 108, 122 (2d Cir. 2008). Knowledge of a conspiracy or proximity to it is by itself insufficient to prove that a defendant joined the conspiracy. United States v. Desimone, 119 F.3d 217, 223 (2d Cir. 1997). Still, the government may prove a defendant's involvement in a conspiracy through circumstantial evidence, such as the defendant's presence at critical moments of the conspiracy, lack of surprise when discussing the conspiracy with others, possession of items important to the conspiracy, and making of false exculpatory statements or otherwise exhibiting consciousness of guilt. Id.; In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 113 (2d Cir. 2008); United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004).

The defendants argue that the district court erroneously allowed the prosecution to rely on evidence that they engaged in other arms transactions with the informants

42

to overcome the lack of evidence that they conspired with each other to acquire and export SAMs. We disagree and conclude that there was sufficient evidence that the defendants conspired with each other to acquire and export SAMs.

A conspiracy violation of § 2332g requires three elements: (1) the defendants intended to agree (2) with each other, not just with undercover agents, (3) to knowingly acquire and export SAMs. See Desimone, 119 F.3d at 223 ("Because a conspiracy requires the participation of at least two culpable co-conspirators, it follows that a person who enters into such a conspiratorial agreement while acting as an agent of the government, either directly or as a confidential informant, lacks the criminal intent necessary to render him a *bona fide* co-conspirator." (brackets, internal citations, and internal quotation marks omitted)).

At trial, the government presented evidence of the following: (1) Al Kassar negotiated a sale of SAMs to the DEA agents in the presence of al Ghazi and Godoy, translating for al Ghazi as needed; (2) al Ghazi confessed to working with al Kassar and Godoy to sell SAMs to the DEA agents in order to make a profit; (3) in the presence of

43

Godoy and al Ghazi, al Kassar provided the DEA with schematics of SAMs and explained how the missiles could be used to shoot down American helicopters; (4) Godoy and al Kassar facilitated a meeting between the DEA agents and the captain of the cargo ship that was to smuggle SAMs into Suriname; (5) Godoy forwarded emails to al Kassar from the DEA agents, which discussed al Kassar's agreement to sell SAMs to the DEA agents; (6) al Kassar and Godoy traveled to factories that produced SAMs after meeting with the DEA agents; (7) al Ghazi advised the DEA agents on how to successfully negotiate the weapons deal with al Kassar, with knowledge that the deal included SAMs; (8) Godoy and al Ghazi traveled to Romania to pick up the final payment for a sale of weapons that included SAMs.

Taken in the light most favorable to the prosecution and drawing all reasonable inferences and credibility determinations in its favor, we conclude that this evidence was legally sufficient for a rational jury to conclude that each of the three defendants intentionally conspired with each other to knowingly acquire and export SAMs.

Having rejected all of the defendants' challenges, we affirm their convictions under 18 U.S.C. § 2332g.

44

**V**

The defendants challenge their convictions under 18 U.S.C. § 2339B (prohibiting material support for a known terrorist organization), arguing in the alternative that the district court misinterpreted the statute's scienter requirements, or the statute is unconstitutional under the Fifth Amendment. We review de novo questions of a statute's interpretation and constitutionality. United States v. Pettus, 303 F.3d 480, 483 (2d Cir. 2002).

In relevant part, § 2339B states:

> Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both . . . . To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . . that the organization has engaged or engages in terrorist activity . . . or that the organization has engaged or engages in terrorism.

18 U.S.C. § 2339B(a)(1). The statute thus imposes two express scienter requirements: that the aid be intentional and that the defendant know the organization he is aiding is a terrorist organization or engages in acts of terrorism. Id. The statute is silent as to whether the defendant must intend that his aid support the terrorist aims of the organization.

45

The defendants argue that this specific intent requirement should be read into the statute and that the district court committed reversible error in failing to so instruct the jury.  This argument is foreclosed by <u>Holder v. Humanitarian Law Project</u>, 130 S. Ct. 2705 (2010) ("<u>Law Project</u>").  As <u>Law Project</u> interpreted § 2339B, it does not require the government to show that a defendant who supported a terrorist organization (which might do other things) intended to aid its specifically terrorist aims: "Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activity."  <u>Id.</u> at 2717.  We therefore reject the defendants' request that we read this scienter requirement into the statute.

The defendants argue, in the alternative, that absent this scienter requirement the statute violates the Fifth Amendment's Due Process Clause in two ways:  [i] by criminalizing mere membership, and [ii] by criminalizing a status insufficiently connected to illegal activity to satisfy the "personal guilt" requirement of due process.  See <u>Scales v. United States</u>, 367 U.S. 203, 224-25 (1961) (a

law criminalizing mere membership in an organization, even one that advocates illegal activity, violates Due Process); id. ("[G]uilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity . . . that relationship must be sufficiently substantial to satisfy the . . . personal guilt" requirement of due process.).

Law Project, which upheld § 2339B against the claim that it unconstitutionally criminalized mere membership, also forecloses these arguments.[4]  130 S. Ct. at 2730 ("[§ 2339B] does not penalize mere association with a foreign terrorist organization. . . .  What [it] prohibits is the act of giving material support. . . .  Our decisions scrutinizing penalties on simple association or assembly are therefore inapposite.").  We therefore reject the defendants' argument that the statute's lack of a specific intent requirement amounts to the criminalization of mere membership.

_____

[4] Law Project construed this as a First Amendment, not Fifth Amendment, challenge, but its reasoning applies equally to challenges under either Amendment.

Law Project also concluded that the aid prohibited by § 2339B (whether accompanied by specific intent to further the organization's terrorist activity or not) is intimately associated with criminal activity. Id. at 2729 ("Congress and the Executive, however, have concluded [that] . . . the designated foreign terrorist organizations are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.") (internal quotation marks omitted). The "personal guilt" requirement of the Due Process Clause is therefore satisfied by the knowing supply of material aid to a terrorist organization.

For these reasons, we conclude that the district court's jury instruction was correct and that 18 U.S.C. § 2339B does not violate the Fifth Amendment, notwithstanding that no proof is required that a defendant intend his aid to support the terrorist activity of a terrorist group.

**VI**

Al Ghazi challenges the legal sufficiency of the evidence that he conspired with al Kassar and Godoy to kill U.S. officers and to materially support a known terrorist organization. 18 U.S.C. §§ 1114, 1117, 2339B. The standard

48

of review for this challenge is set out above in Section IV.D. Under that standard, we reject al Ghazi's challenge.

At trial, the government presented evidence of the following: (1) al Ghazi told the DEA agents he knew al Kassar was negotiating a weapons deal with FARC; (2) al Ghazi told the DEA agents he knew FARC was a terrorist organization; (3) al Ghazi told the DEA agents he knew the weapons deal included SAMs; (4) al Ghazi told the DEA agents he knew FARC intended to use the weapons they were buying to kill U.S. military personnel; (5) al Ghazi told the DEA agents he facilitated the weapons deal to get a commission; (6) al Ghazi was present during key negotiations in the weapons deal, with al Kassar translating for him when Spanish was spoken; (7) al Ghazi stayed at al Kassar's mansion during the negotiations with no apparent purpose other than to participate in them; (8) al Ghazi advised the DEA agents how to successfully complete the weapons deal with al Kassar; (9) al Kassar told the DEA agents that al Ghazi was instrumental to his decision to negotiate with them; and (10) al Ghazi went to Romania for the purpose of receiving the final payment for the weapons that al Kassar sold to the DEA agents, which included SAMs. Taken in the

49

light most favorable to the prosecution and construing all inferences and credibility determinations in its favor, this evidence is sufficient for a reasonable jury to conclude that al Ghazi intentionally agreed with al Kassar and Godoy to acquire SAMs and other weapons, and to sell them to an organization he knew engaged in terrorism and which he knew would use those weapons to kill U.S. personnel.

We therefore reject al Ghazi's insufficiency challenge.

**CONCLUSION**

For the reasons discussed above, the judgments of the district court are **AFFIRMED**.

50