UNITED STATES of America

v.

Hanley GOMEZ, a/k/a "Ace," Darnell Woodhouse, Donald Wallace, Franli Santiago, and Linda Treamvicharnkul, Defendants.

No. 14 Cr. 459(SAS).

United States District Court, S.D. New York.

Signed Dec. 2, 2014.

Brooke Elizabeth Cucinella, Edward B. Diskant, Assistant United States Attorneys, New York, NY, for the Government.

Bobbi C. Sternheim, Esq., Law Offices of Bobbi C. Sternheim, New York, NY, for Defendant Gomez.

William Joseph Stampur, Esq., Stampur & Roth, New York, NY, for Defendant Treamvicharnkul.

Thomas Francis Dunn, Esq., New York, NY, for Defendant Santiago.

George Robert Goltzer, Esq., New York, NY, for Defendant Wallace.

Winston Lee, Esq., New York, NY, for Defendant Woodhouse.

## OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge:

## I. INTRODUCTION

Hanley Gomez, Darnell Woodhouse, Donald Wallace, Franli Santiago, and Linda Treamvicharnkul all face charges of conspiracy to distribute narcotics, conspiracy to commit Hobbs Act robbery, and possession of a firearm in connection with the foregoing crimes, stemming from the Defendants' participation in a fictitious, government-invented stash-house robbery. Defendants Gomez, Wallace, Treamvicharnkul, and Woodhouse ("Defendants") move to dismiss the indictment based on allegations of outrageous government conduct, or in the alternative, through the Court's inherent supervisory power. Defendants also request an evidentiary hearing on this matter.

For the reasons set forth below, Defendants' motion is DENIED.

## II. BACKGROUND [1]

In April 2014, DEA Special Agent Todd Riley was contacted by a cooperating witness ("CW-1"), who told Riley about Hanley Gomez and Reported that Gomez had bragged about robberies in the past.[2] At the Government's direction, CW-1 told Gomez about a possible robbery opportunity, and Gomez expressed his interest.[3]

In addition to numerous telephone conversations, Gomez met with CW-1 and another cooperating witness ("CW-2") in person on three further dates to discuss and plan the robbery. On or about May 7, 2014, Gomez discussed the possible robbery with CW-1 and CW-2 and reported that he had guns, cars, and masks to carry out the robbery, that he was willing to use a weapon if necessary, that he planned on using a "stash" car to hide the guns, and that he had "put guns to people's heads before" and cooks cocaine into crack for sale[4]. At a meeting on May 20, 2014, Gomez stated that he had guns, cars and hoodies ready for the robbery.[5] He explained that the female in the crew would be holding the firearms and would be responsible for disposing of them after the robbery, and stated that two of the guns were his personal guns.[6] Finally, on or about June 8, 2014, Gomez and Woodhouse met with CW-1 and CW-2 to discuss the details of the robbery[7]. They discussed that the female would arrive separately in a car with the firearms, and that Gomez and Woodhouse would conduct surveillance of the intended victims while they were en route with the narcotics.[8] They also discussed the expected shipment of approximately twenty kilograms of cocaine and two kilograms of heroin, as well as how they intended to split the drugs.[9]

On or about June 10, 2014, the planned day for the robbery, Gomez contacted CW-1 and stated that he wanted to meet

---

1. The facts below are taken from the Complaint ("Compl.").

2. See Compl. ¶¶ 7–8.

3. See id. ¶ 9.

4. Id. ¶ 11(e).

5. See id. ¶ 11(k).

6. See id.

7. See id. ¶ 11(n).

8. See id.

9. See id.

in person to confirm plans.[10] Gomez, Woodhouse, and Wallace later met with CW–2 to discuss details of the robbery.[11] Santiago was also present but remained in his car.[12] Later that evening, Gomez, Woodhouse, and Wallace again met with CW–2 and confirmed that they were ready to carry out the robbery that night.[13] Gomez and Woodhouse indicated that they would contact "the girl" who would arrive with the firearms.[14] Gomez, Woodhouse, and Wallace also told CW–2 that Wallace "does robberies for a living."[15] Gomez and Woodhouse then confirmed that "the girl" had arrived and that they were ready to carry out the robbery.[16]

At the Government's direction, CW–2 indicated to Gomez, Woodhouse, and Wallace that the robbery victims were en route and that they should follow CW–2 to the robbery location.[17] With Gomez, Woodhouse, Wallace and Santiago in one car, and Treamvicharnkul driving a second car, all defendants followed CW–2 to the robbery location.[18] When both cars arrived at the robbery location, law enforcement agents stopped the cars, informed the defendants that they were under arrest, and directed them to leave the cars.[19] The Government recovered gloves, a ski mask, and military gear, as well as a gym bag with additional gloves, three firearms, and a loaded magazine.[20]

On July 10, 2014, a grand jury returned an indictment charging all defendants with one count of conspiracy to distribute narcotics in violation of 21 U.S.C. § 846, one count of conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951, and possession of a firearm in connection with the narcotics crime charged in Count One and the crime of violence charged in Count Two in violation of 18 U.S.C. § 924(c).[21]

Gomez filed a motion to dismiss the indictment based on outrageous government conduct, or in the alternative, through the Court's inherent supervisory powers. Gomez also seeks a factual hearing. Woodhouse, Wallace, and Treamvicharnkul subsequently joined the motion.

## III. APPLICABLE LAW

██ The Second Circuit recognizes that "[g]overnment involvement in a crime may in theory become so excessive that it violates due process and requires the dismissal of charges against a defendant...."[22] Unlike entrapment, the inquiry focuses on the conduct of the government agents, rather than that of the defendants.[23]

██ To establish a due process violation, the conduct must be " 'so outrageous that common notions of fairness and decency would be offended were judicial pro-

---

10. *See id.* ¶ 11(*o*).

11. *See id.* ¶ 11(q).

12. *See id.* ¶ 11(p).

13. *See id.* ¶ 12(¶ a).

14. *Id.*

15. *Id.*

16. *Id.* ¶ 12(b).

17. *See id.* ¶ 12(c).

18. *See id.* ¶ 12(d)..

19. *See id.* ¶¶ 13, 13(a)-(b).

20. *See id.* ¶¶ 13(c)-(d).

21. *See id.* ¶¶ 1–5.

22. *United States v. Al Kassar,* 660 F.3d 108, 121 (2d Cir.2011) (citing *United States v. Rahman,* 189 F.3d 88, 131 (2d Cir.1999)).

23. *See id.*

cesses invoked to obtain a conviction.' " [24] "[I]n view of the courts' well-established deference to the Government's choice of investigatory methods, the burden of establishing outrageous investigatory conduct is very heavy." [25] Examples of conduct that would "shock the conscience" [26] and meet this burden are "egregious invasions of individual rights," [27] such as coercion or physical force.[28]

 However, no violation occurs when "the government merely create[s] the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive." [29] Similarly, "feigned friendship, cash inducement, and coaching in how to commit the crime do not constitute outrageous conduct." [30] Further, "whether investigative conduct violates a defendant's right to due process cannot depend on the degree to which the governmental action was responsible for inducing the defendant to break the law." [31]

The Second Circuit has never found a violation of due process based on the government's outrageous conduct, and has described the claim as "an issue frequently raised that seldom succeeds." [32] "Nevertheless, a claim that the government has acted outrageously is taken seriously because ensuring that the government does not trample in an unconscionable manner on individual dignity is a bed-rock duty of judicial officers." [33]

## IV. DISCUSSION

Gomez cites the "entirely fake stash-house scheme" as evidence of the government's outrageous conduct.[34] He argues that Special Agent Riley "manufactured this entire crime" and that there was no "ongoing criminal enterprise" that the Government infiltrated.[35] He further contends that the Government preyed on him because he is poor and therefore more likely to take the bait.[36] He contends he was targeted because CW–1 had personal information about his circumstances, including that he was unemployed and had a small child.[37]

 None of these allegations can sustain a claim of outrageous government conduct. "[M]erely creat[ing] the opportunity for the offense" has been held to be an

---

24. *United States v. Bout,* 731 F.3d 233, 238 (2d Cir.2013) (quoting *United States v. Schmidt,* 105 F.3d 82, 91 (2d Cir.1997)).

25. *Rahman,* 189 F.3d at 131.

26. *United States v. Cromitie,* 727 F.3d 194, 221 (2d Cir.2013).

27. *Rahman,* 189 F.3d at 131.

28. *See Al Kassar,* 660 F.3d at 122.

29. *Id.* at 121.

30. *Id.* (citing *United States v. Myers,* 692 F.2d 823, 837–39 (2d Cir.1982)).

31. *United States v. Chin,* 934 F.2d 393, 398 (2d Cir.1991).

32. *Schmidt,* 105 F.3d at 91.

33. *Id.*

34. Gomez's Motion to Dismiss Indictment for Outrageous Government Conduct ("Def. Mem.") at 6.

35. *Id.* at 7.

36. *See id.*

37. *See id.* at 3. Based on the facts alleged in the complaint, only Gomez, and not the other defendants, can claim to have been targeted by the Government. Gomez himself found the other defendants and brought them to the attention of the Government. Nevertheless, this Court does not address whether the other defendants who have joined this motion have standing, because, even assuming, *arguendo,* that standing exists, their claim fails.

acceptable law enforcement tool.[38] Indeed, the Second Circuit has declined to find outrageous conduct in cases involving far more elaborate ploys and far greater government involvement than what is alleged here.[39] The absence of a conspiracy prior to government involvement has similarly been rejected as grounds to find outrageous conduct, as this shows "only that the government created the opportunity for illegal conduct."[40] Additionally, even extremely large financial inducements do not violate due process.[41] The simple fact that Gomez needed money, and that the Government exploited that fact in creating the opportunity for the crime, does not reach the level of coercion necessary to amount to a due process violation.

Gomez relies heavily on a recent district court case from the Central District of California that dismissed the indictment against the defendant based on a claim of outrageous government conduct, where the Government invented a stash house robbery similar to the facts alleged here.[42] His reliance is misplaced. Critically, the Ninth Circuit employs a different standard than that used by the Second Circuit. In reaching its decision, the district court in *Hudson* used a totality of the circumstances test that assessed, *inter alia,* " 'the government's role in creating the crime of conviction ... [and] the government's encouragement of the defendants to commit the offense conduct.... ' "[43] However, the Second Circuit has repeatedly stated that government encouragement, even if extensive, does not amount to outrageous conduct unless it rises to the level of coercion or physical force leading to "egregious invasions of individual rights."[44]

Neither Gomez nor any other defendant here alleges any government conduct that meets this standard. Beyond this, none of the defendants deny the Government's allegations of the defendants' eager participation in the alleged crimes. After learning about the fictitious stash house robbery opportunity, Gomez repeatedly met with the CWs to plan the robbery and assembled a crew to carry it out. Gomez, along with the other defendants, provided the cars, gloves, ski masks, and

38. *See Al Kassar,* 660 F.3d at 121.

39. *See, e.g., Cromitie,* 727 F.3d at 217–21 (holding that there was no outrageous conduct where Government agents "planned the entire operation," "supplied the fake bombs and instructed the defendants how to detonate them").

40. *Al Kassar,* 660 F.3d at 121.

41. *See id.* (citing *Myers,* 692 F.2d at 837–38).

42. *See United States v. Hudson,* 3 F.Supp.3d 772 (C.D.Cal.2014), *appeal docketed sub nom. United States v. Dunlap,* No. 14–50129 (9th Cir. Mar. 18, 2014); *United States v. Roberts,* 13 Cr. 751 (C.D.Cal. May 30, 2014). Gomez also points to a recent case in the Northern District of Illinois where the court ordered additional discovery to determine whether the Government was targeting minorities in connection with investigating and prosecuting

fake stash house cases. *See United States v. Brown,* 12 Cr. 632 (N.D.Ill. Oct. 3, 2014). However, apart from noting that Gomez is Dominican, and that defendants in other cases are "believed to be predominantly either Black or Latino," Gomez provides no facts regarding selective prosecution or enforcement. Def. Mem. at 15. Nor does he allege an Equal Protection violation or request discovery to investigate any potential violation. Thus, I decline to address this issue.

43. *Hudson,* 3 F.Supp.3d at 778 (quoting *United States v. Black,* 733 F.3d 294, 302 (9th Cir.2013)).

44. *Rahman,* 189 F.3d at 131. *Accord Myers,* 692 F.2d at 843 (citing cases rejecting due process challenges where a defendant was solicited twenty times before committing an offense and where a defendant was tempted by a million-dollar cash deal and prodded by veiled threats).

guns. Even crediting all of Gomez's arguments, this is not a case where the defendants were simply bystanders in an elaborate Government plot. Instead, the Government presented the opportunity to commit a crime, albeit an invented one, and the defendants willingly and actively participated. Thus, the alleged Government conduct does not meet the necessary threshold to be considered outrageous. Neither does it justify this Court invoking its supervisory powers to dismiss the indictment.

Finally, no hearing on this matter is necessary. A hearing may be appropriate where there are disputed facts related to the Government's conduct. However, Gomez has not cited any disputed facts.[45] Moreover, assuming Gomez's account of the investigation is true, the conduct alleged does not amount to outrageous conduct. Thus, a hearing is unnecessary.

## V. CONCLUSION

For the foregoing reasons, Gomez's motion is DENIED.

SO ORDERED.

---

**45.** *See Al Kassar,* 660 F.3d at 122 ("Where, as here, there are no material facts in dispute related to the alleged government misconduct, no hearing is necessary.") (citing *United States v. LaPorta,* 46 F.3d 152, 160 (2d Cir. 1994)). There is some dispute regarding Gomez's previous criminal history. However, even if the defendant had *no* predisposition to commit this crime, it is irrelevant here as the Government's conduct does not meet the standard for outrageous conduct.