**UNITED STATES of America,**
**Appellee,**

v.

**Norman GOLDSTEIN, Defendant–Appellant.**

**Docket No. 04–1689–CR.**

United States Court of Appeals,
Second Circuit.

Argued: Feb. 3, 2005.

Decided: March 29, 2006.

Harry Sandick, Assistant United States Attorney for the Southern District of New York (David N. Kelley, United States Attorney, and Lisa G. Horwitz and Roberto Finzi, Assistant United States Attorneys, of counsel), New York, NY, for Appellee.

Roger Bennet Adler, Roger Bennet Adler, P.C., New York, NY, for Defendant–Appellant.

Before: WALKER, Chief Judge, HALL, and JOHN R. GIBSON,* Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Norman Goldstein was convicted by a jury of five counts of access device fraud under 18 U.S.C. § 1029(a)(2) and (5). He was sentenced to 70 months' incarceration to be followed by three years of supervised release and ordered to make restitution in the amount of $776,612.00. On appeal, Goldstein challenges (1) the jury instructions as to Count 1, (2) the sufficiency of the evidence supporting Counts 1 and 3, (3) the effect of certain evidence on his Sixth Amendment right of confrontation, and (4) the two-level sentencing enhancement for his role in the offense and the four-level increase for deriving more than one million dollars in gross receipts from the offenses. We affirm his conviction and remand for resentencing.

Norman Goldstein operated A–1 Hotels, a business that provided hotel bookings for customers at discounted rates. When a customer made a reservation, A–1 immediately charged the customer's credit card and the next day mailed the customer a confirmation and voucher for the hotel. The confirmation form stated that customers could cancel their reservations without penalty up to 48 hours before their designated arrival date. However, A–1 did not place the actual hotel reservation when the customer made it. Instead, A–1 typically contacted the designated hotel approximately three days before the customer was to arrive. On occasion, the hotel in question would not have rooms available and the customer's purported reservation could not be honored.

---

* The Honorable John R. Gibson, Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

Five of A–1's unsatisfied customers testified at trial. Some told of similar situations in which they arrived at a hotel, believing they had paid for rooms that had been reserved for them, only to discover that no reservation was in place, the hotel had received no money on their account, and no rooms were available. Others testified that they cancelled their reservations within the period A–1 allowed but their credit cards were still charged for the rooms. Some of these customers were unable to get refunds from A–1 and had to dispute the charges with their credit card companies.

Chaniqua Conner, a former A–1 employee who testified under a non-prosecution agreement, described the day-to-day operation of A–1's business. The business employed seven people including Goldstein, his father-in-law, and his wife. Goldstein identified himself as Mike Beer when he hired Conner, but she later learned his real name. The office was small enough that Conner could hear other telephone conversations from her desk, and from time to time Conner heard Goldstein identify himself as Mike Beer or one of several other aliases in telephone conversations with customers. Goldstein assigned each alias a position such as reservation manager, manager, controller, or accounting department employee. Indeed, at Goldstein's direction, Conner and other employees falsified their own names in conversations with customers in order to make the business "seem bigger."

A–1 received several calls each day from customers complaining about unavailable rooms, delayed refunds, or unauthorized credit card charges. All such calls were transferred to Goldstein. It was during these calls that Goldstein would often adopt different names, even taking on two or more in the same call as he purported to transfer a customer from one department to another. Goldstein would some-

times direct Conner or another employee to process a refund after having received a complaint, but that was not always the last word. On occasion, Goldstein would further direct these employees to void refunds, which effectively cancelled them. He also told employees to re-charge some customers after their first charge had been refunded. In other instances he simply refused to issue a refund to a customer who had either cancelled a reservation or was without accommodations because a hotel had no vacancy, thereby forcing the customer to dispute the credit card charge through the issuing bank or company.

This latter practice is known as a "chargeback," which describes a successful customer challenge to a credit card charge through the issuing entity, which in turn charges the amount back to the business. The result for the customer is the same in both a refund and a chargeback—the customer ultimately is not responsible to pay the disputed amount—but a business voluntarily gives a refund and involuntarily suffers a chargeback. The government introduced evidence demonstrating that A–1's chargeback rate and refund rate far exceeded both the nationwide and hotel industry averages.

The government introduced evidence concerning A–1's banking and credit card practices. A–1 maintained a merchant bank account with Sterling National Bank so that its customers could pay for hotels with a credit card. When a customer authorized a charge A–1's bank account was credited in that amount, and conversely it was debited when A–1 issued a refund or suffered a chargeback. Sterling Bank began monitoring A–1's merchant account because of an unusually high number of chargebacks, and the account was frequently overdrawn. The bank required A–1 to deposit more money in reserve and had at least weekly meetings with Gold-

stein to try to keep the account in balance. When those year-long efforts proved fruitless, Sterling Bank closed the account.

Goldstein was indicted on one count of trafficking in and using credit card numbers without authorization and on four counts of making unauthorized charges to separate credit cards. He was convicted by a jury on all five counts, and the district court denied his motions for judgment of acquittal and new trial.

## I.

■ Goldstein alleges that the district court erred by giving jury instructions with respect to Count 1 that were prejudicial and insufficient. The propriety of jury instructions is a question of law that we review de novo; the question is whether the challenged instruction misled the jury as to the correct legal standard or did not adequately inform the jury on the law. *United States v. Pimentel,* 346 F.3d 285, 301 (2d Cir.2003). We vacate the conviction only if the error was prejudicial; we will not disturb the judgment if the error was harmless. An erroneous instruction is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. *Id.* at 301–02.

■ Goldstein acknowledges that the district court correctly instructed the jury that good faith is a complete defense to a fraud charge. However, he asserts that the instruction was undermined when the district court added language that improperly required the jury to find that Goldstein's good faith was objectively reasonable. *See Cheek v. United States,* 498 U.S. 192, 203, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) (holding that claimed good-faith belief need not be objectively reasonable).

Goldstein concedes that our review is for plain error because he made no objection at trial. *United States v. Bala,* 236 F.3d 87, 94 (2d Cir.2000).

When we review for plain error, we examine the challenged language in context by looking at the instructions as a whole to determine if the jury was given a correct interpretation of the law. *Id.* at 94–95. This standard requires an error that is plain and affects substantial rights. If those three conditions are met, we may exercise our discretion to review the error, but only if it seriously affects the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Rossomando,* 144 F.3d 197, 200 (2d Cir.1998). After instructing the jury as to the elements of "intent to defraud," the district court addressed the defense of good faith.[1] Goldstein's challenge is to the italicized words in the following passage:

Since an essential element of the crime charged is intent to defraud, it follows that good faith on the part of the defendant is a complete defense to a charge of access device fraud. If the defendant actually believed that he was authorized to use the access devices and *took reasonable steps to check out that belief,* then the defendant acted in good faith. The defendant, however, has no burden to establish a defense of good faith. The burden is on the government to prove fraudulent intent and the consequent lack of good faith beyond a reasonable doubt.

In considering whether or not the defendant acted in good faith, you are instructed that a belief by the defendant, if such belief existed, that ultimately everything would work out so that no one

---

1. The language comes from the model instruction given in 2 Leonard B. Sand, et al., *Modern Federal Jury Instructions—Criminal* § 40.01, Instruction No. 40–14 (2005). Our holding in this case, based on a plain error standard of review, is not an endorsement of the model instruction.

would lose any money does not require a finding by you that he acted in good faith. No amount of honest belief on the part of the defendant that the transactions will somehow work out in the end will excuse him if he obtained or used an access device with intent to defraud.

As a practical matter, then, in order to sustain the charges against the defendant, the government must establish beyond a reasonable doubt that he knew his conduct was calculated to deceive and nonetheless he undertook the activity for the purpose of causing some loss to another.

Goldstein asserts that the italicized passage is tantamount to an instruction that the jury could not conclude that he acted in good faith unless they found that he had an objectively reasonable belief that he was authorized to use the credit cards at issue. He contends that this improperly shifted the burden to him to prove his good faith.

While Goldstein's argument at first has some appeal, our review of the instructions as a whole leads us to conclude that the district court did not commit plain error by including the phrase "took reasonable steps to check out that belief." While the phrase certainly evokes objectivity, the very next sentence of the instruction contains a specific directive that Goldstein had no burden to prove his good faith. Moreover, the jury was further instructed that it could not convict Goldstein on the first count unless the government proved beyond a reasonable doubt that Goldstein's conduct was calculated to deceive and that he intended to cause loss through his conduct. Taken as a whole, the charge appropriately interpreted the law of good faith.

## II.

■ Count 1 charged Goldstein with using one or more unauthorized access devices (credit cards) within one year to ob-

tain anything of value aggregating at least $1,000. Goldstein argues that the district court erred in refusing to instruct the jury that it had to agree unanimously as to which access devices he used because due process requires unanimous findings as to every element of Count 1.

Although this question has yet to be addressed in this Circuit, we are persuaded by the holding of the First Circuit in *United States v. Lee*, 317 F.3d 26, 35–40 (1st Cir.2003), that the identity of the particular credit cards is not an element of the offense but instead is a fact used to prove an element. The statute's focus is on the amount of money people have lost through fraud rather than the number of people who have been defrauded.

> An examination of the structure of section 1029 fortifies our belief that the identity of the particular credit cards should not be deemed an element of the offense. That global view leaves a clear impression that Congress intended to target fraudulent access crimes of a particular scope, such as those surpassing certain value thresholds, *see, e.g.,* 18 U.S.C. § 1029(a)(5) . . . .

*Id.* at 38. Section 1029(a)(5) addresses fraudulently effecting transactions with "one or more" access devices. The same language criminalizing the fraudulent use of "one or more" access devices appears in Section 1029(a)(2), under which Goldstein was convicted in Count 1. Because the identity of the credit cards was merely a fact used to prove an element of Count 1, it was not necessary for the jury to agree on which credit cards Goldstein used.

Moreover, this subsection requires the government to prove that Goldstein obtained something of value amounting to $1,000 or more during a twelve-month period, and the jury was so instructed. The charge also included a directive that the jury "must agree unanimously on which

$1,000 worth of goods, services or money and which twelve-month period the government has proved beyond a reasonable doubt." Thus, if the jury unanimously agreed on which hotel charges Goldstein fraudulently caused to be made, it follows that the jury also unanimously agreed on the specific credit cards he used. The record contains no evidence that any of A–1's customers used more than one credit card or complained that A–1 had caused a charge to be made to the wrong credit card.

The district court did not err by omitting an instruction requiring the jury to unanimously agree on which credit cards Goldstein improperly used.

### III.

Goldstein alleges that the district court made a third instructional error. He contends that a conviction for access device fraud under 18 U.S.C. § 1029(a)(2) cannot be supported unless the government proves that he possessed a fraudulent intent when he obtained his customers' credit cards. He asserts that the charge did not require the jury to make such a finding. However, when Goldstein objected to the proposed instruction, the district court agreed to and did change the language to read: "Third, that the defendant acted knowingly, willfully and with intent to defraud in obtaining the unauthorized access device." Goldstein made no further objection, and thus we review for plain error. *United States v. Rossomando,* 144 F.3d 197, 200 (2nd Cir.1998).

The statute criminalizes the conduct of a person who "knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period." 18 U.S.C. § 1029(a)(2). The words of the instruction, taken at face value, clearly directed the jury to focus on Goldstein's conduct at the time he obtained the credit cards. The district court's in-

struction adequately conveyed the correct interpretation of the law and, as we discuss in the next section, the evidence at trial was sufficient to demonstrate Goldstein's fraudulent intent. The district court's instruction was not in error.

### IV.

Goldstein asserts that the evidence adduced at trial was legally insufficient to convict him of the fraud charges contained in Counts 2 and 3. He alleges that the government did not establish that he had the requisite mens rea at the time the defrauded customers' credit cards were charged. Goldstein further contends that there was insufficient evidence that he obtained the statutory minimum of goods or services valued at no less than $1,000 as a result of the fraudulent acts alleged in Counts 2 and 3. We consider Goldstein's sufficiency challenge by viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in its favor. *United States v. Autuori,* 212 F.3d 105, 108 (2d Cir.2000).

The record supports the sufficiency of the evidence upon which Goldstein was convicted on Counts 2 and 3. Chaniqua Conner, an employee of A–1, testified that Goldstein would negotiate hotel rates with customers without verifying those rates with the given hotels. Although Goldstein charged the customers' credit cards as soon as they called A–1 to make a reservation, he did not place the reservation until immediately before the customer was to begin his or her hotel stay. Goldstein often used false names and directed his employees to do the same when they were talking with customers, both during initial calls and when customers would call with complaints. This evidence, when viewed in the light most favorable to the government, supports the jury's conclusion that Goldstein possessed intent at the time the

credit cards were charged. *See United States v. Ismoila,* 100 F.3d 380, 387, 390 (5th Cir.1996) (holding that intent in unauthorized access device case can be established with circumstantial evidence).

■ Goldstein argues that, because Katy Jo Steward testified that she ultimately suffered no financial loss from the non-existent reservations she made through A–1 because she was able to find other comparable accommodations, there was insufficient evidence to convict him under Count 2. Steward's testimony established that Goldstein caused her credit card to be charged for reservations that did not exist and, in spite of her request, she never received a refund. Instead, she found it necessary to dispute the charge through her credit card company, which ultimately reimbursed her.

Goldstein advances the same argument with respect to Count 3. Jill Patchin made a group reservation through A–1 for rooms at a New York hotel on behalf of the Grand Rapids, Michigan Civic Theater. After a series of billing problems and unresolved charges to the Civic Theater's credit card, she contacted the hotel directly because she had become suspicious about Goldstein's (Jack Kay to her) veracity. When she learned that no reservations existed, she worked directly with the hotel to get accommodations. She, too, was unsuccessful at getting a refund from A–1 and spent seven months disputing the charges through the credit card issuer.

■ Goldstein's argument that Steward and the Civic Theater suffered no loss because ultimately they were able to get satisfaction through the credit card issuers does not square with the law. "Loss" is measured at the moment the credit cards were charged; if the charge was fraudulent at the time it was made, the loss was concomitant with the criminal act. The customers' later efforts to mitigate the loss through other means is irrelevant. *See*

*United States v. Bald,* 132 F.3d 1414, 1416–17 (11th Cir.1998).

The evidence at trial was sufficient to convict Goldstein on Counts 2 and 3.

## V.

■ Goldstein also challenges the district court's allowance of evidence concerning A–1's customer chargeback complaints and resolutions as a violation of his Sixth Amendment right of confrontation. "Chargeback" is a term of art in the credit card industry that refers to refunds customers receive from merchants after a dispute resolution process. In chargebacks, the merchants do not voluntarily give a refund as they do when they issue a credit to the customer. Goldstein asserts that the hearsay testimony and exhibits offered by bank and credit card industry witnesses were unreliable and biased. While he acknowledges that the district court repeatedly gave a limiting instruction which directed the jurors that they could not consider the evidence for the truth of the matters asserted therein, Goldstein asserts the instruction was insufficient to protect his rights.

We review Confrontation Clause violations for harmless error in instances where the error is preserved, *United States v. McClain,* 377 F.3d 219, 222 (2d Cir.2004), and we review for plain error where it is not, *United States v. Bruno,* 383 F.3d 65, 78 (2d Cir.2004). Goldstein objected at trial to certain hearsay testimony from witnesses Rader and McGee which was subject to the district court's limiting instruction, but he does not contest the government's assertion that he either failed to object or agreed to the admission of the documents at issue.

■ Goldstein relies on the Confrontation Clause holding of *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158

L.Ed.2d 177 (2004), to support his argument, although he fails to discuss how that holding applies to his case. *Crawford* holds that a prior testimonial statement made by a declarant who does not testify at trial may not be admitted unless the declarant is unavailable to testify and the defendant had an earlier opportunity to cross-examine the declarant. *Id.* at 59–60, 124 S.Ct. 1354. We have examined the record and conclude that *Crawford* does not apply to this case. The evidence at issue was not "testimonial," as the record contains no indication that the declarants of the hearsay statements had any awareness or expectation that their statements might later be used at trial. *See United States v. Saget,* 377 F.3d 223, 228 (2d Cir.2004), *cert. denied,* 543 U.S. 1079, 125 S.Ct. 938, 160 L.Ed.2d 821 (2005); *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354 (although not spelling out definition of "testimonial," holding that it "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, ... at a former trial[,] and to police interrogations"). Moreover, "[t]he [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59 n. 9, 124 S.Ct. 1354 (citing *Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)). The district court repeatedly instructed the jury that it could not consider the challenged evidence for its truth.

The district court's evidentiary rulings did not violate Goldstein's Confrontation Clause rights.

## VI.

Goldstein appeals the district court's adjustments to his sentence for his supervisory role in the offense and for the effect of his conduct on a financial institution. He asserts that his sentence should be vacated and his case remanded for resentencing in light of *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Goldstein was sentenced before the Supreme Court issued its decision in *Blakely.* The parties' briefs on appeal were filed after *Blakely* was decided but before *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

Goldstein did not object to the district court that his sentence was calculated based on facts found in violation of the Sixth Amendment, but rather he first raised the issue in his appeal to this court after the Supreme Court handed down *Blakely.* Accordingly, he did not properly preserve the issue for appellate review, *see United States v. Lake,* 419 F.3d 111, 113 (2d Cir.2005), and we therefore analyze Goldstein's Sixth Amendment claim under the plain error standard, *United States v. Crosby,* 397 F.3d 103, 114–18 (2d Cir.2005). Pursuant to *Crosby,* we remand so that the district court can determine whether to resentence Goldstein. *Id.* at 120.

With respect to the two non-Constitutional sentencing arguments that Goldstein advances regarding the district court's Guidelines calculations, we review those here for the guidance of the district court on remand. First, Goldstein asserts that the district court should not have imposed a two-level enhancement under § 3B1.1(c) [2] for his having had a supervisory role in the offense. The district court imposed that enhancement based on the participation in the offense conduct of Chaniqua Conner, who testified pursuant to a non-prosecution agreement. Second, Goldstein objects to the four-level increase in his offense level under § 2F1.1(b)(7)(B) that the district court imposed based on a finding that Goldstein's offense affected a financial institution and Goldstein derived

---

**2.** The district court applied the 1998 edition    of the Guidelines.

more than $1 million in gross receipts from the offense. After *Booker:*

> [i]n the absence of a statutory *de novo* standard of review, we select the appropriate standard according to the nature of the issue presented. We review issues of law *de novo,* issues of fact under the clearly erroneous standard, mixed questions of law and fact either *de novo* or under the clearly erroneous standard depending on whether the question is predominantly legal or factual, and exercises of discretion for abuse of discretion.

*United States v. Selioutsky,* 409 F.3d 114, 119 (2d Cir.2005) (citations omitted).

Goldstein's argument that he was not in a supervisory role with respect to Ms. Connor is that she was not sufficiently sophisticated to understand that what she was doing was wrong and therefore she was not a participant in the criminal operation and had no supervision. The district court's finding to the contrary regarding Ms. Connor's state of mind is amply supported by the evidence and is not clearly erroneous. On remand, the district court should continue to apply the supervisory role enhancement when making a Guidelines determination.

In his argument concerning the four-level increase in his offense level, Goldstein concedes that his conduct affected a financial institution but he disputes that he derived more than $1 million in gross receipts from the offense. He argues that "gross" receipts should be interpreted to mean the amount of money he actually gained from the offense. He further argues that there was insufficient evidence that he personally received any of the funds, and that the district court's finding was an impermissible piercing of the corporate veil that was unsupported by the evidence and contrary to New York state law. Goldstein thus challenges both the district court's legal interpretation of

"gross receipts" and its factual determinations that he personally received those funds.

The district court's factual findings regarding Goldstein's receipt of the funds are also amply supported by the record and are not clearly erroneous. The district court should continue to apply that finding when making a Guidelines determination on remand.

We review de novo the question of law concerning the definition of "gross receipts." *See United States v. Weisser,* 417 F.3d 336, 346 (2d Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 505, 163 L.Ed.2d 382 (2005). Goldstein essentially argues that the Guideline should be interpreted to apply to net profits when he asserts that the loss calculation should not include amounts customers were credited through refunds or chargebacks. The law in this circuit is to the contrary. *United States v. Khedr,* 343 F.3d 96, 101–02 (2d Cir.2003) ("In short, 'gross receipts' is not the equivalent of 'net profits.' . . .").

> The term "gross receipts" is defined in the Guidelines with reference to 18 U.S.C. § 982(a)(4), which indicates that " '[g]ross receipts from the offense' includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." Application Note 18 to § 2F.1.1.

*Id.* at 101 (quoting 1998 Guidelines). The district court correctly interpreted the meaning of "gross receipts" and should apply that same interpretation upon remand.

## CONCLUSION

We affirm Goldstein's conviction and remand for the district court to reconsider the sentence imposed in light of *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and *United*

*States v. Crosby,* 397 F.3d 103 (2d Cir. 2005).