# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

---

**No. ACM 40168 (f rev)**

---

**UNITED STATES**
*Appellee*

**v.**

**Yasmeen M. LAKE**
Senior Airman (E-4), U.S. Air Force, *Appellant*

---

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 5 October 2023

---

*Military Judge*: Bryon T. Gleisner; Dayle P. Percle (remand).

*Sentence*: Sentence adjudged on 21 April 2021 by GCM convened at Joint Base Langley-Eustis, Virginia. Sentence entered by military judge on 20 May 2021: Bad-conduct discharge, $8,000.00 fine, and reduction to E-2.

*For Appellant*: Major David L. Bosner, USAF.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Major Morgan R. Christie, USAF; Major Deepa M. Patel, USAF; Major John P. Patera, USAF; Captain Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before ANNEXSTAD, GRUEN, and KEARLEY, *Appellate Military Judges*.

Senior Judge ANNEXSTAD delivered the opinion of the court, in which Judge GRUEN and Judge KEARLEY joined.

---

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

---

ANNEXSTAD, Senior Judge:

A panel of officer members sitting as a general court-martial convicted Appellant, contrary to her pleas, of 14 specifications[1] of fraudulent use of a credit card, debit card, or other access device, in violation of Article 121a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 921a; and two specifications[2] of larceny, in violation of Article 121, UCMJ, 10 U.S.C. § 921.[3] The panel sentenced Appellant to a bad-conduct discharge, an $8,000.00 fine, and reduction to the grade of E-2. The convening authority took no action on the findings or sentence.

Appellant's case is before this court for a second time. On 7 December 2022, we remanded this case and returned the record of trial to the Chief Trial Judge of the Air Force Trial Judiciary for correction under Rule for Courts-Martial (R.C.M.) 1112(d). *United States v. Lake*, No. ACM 40168, 2022 CCA LEXIS 706, at *2 (A.F. Ct. Crim. App. 7 Dec. 2022) (order). Specifically, 13 prosecution exhibits in the record of trial were not viewable by this court or the parties because proprietary software was needed to view the video evidence.[4] *Id.* at *1–2. This court returned the record of trial for correction to make the 13 prosecution exhibits viewable. On 24 January 2023, Appellant's case was re-docketed with this court. All parties, to include the court, have been able to view the 13 prosecution exhibits. Therefore, we find that the military judge has complied with our previous order, and the error has been corrected.

Appellant raises five issues, which we have reordered and reworded: (1) whether the military judge abused his discretion by admitting evidence under Mil. R. Evid. 404(b); (2) whether Appellant's convictions are legally and factually sufficient; (3) whether the findings of guilty should be set aside and dismissed because they represent an unreasonable multiplication of charges; (4) whether Appellant is entitled to relief for an unreasonable delay in docketing her case with this court; and (5) whether Appellant was deprived of her right to a unanimous verdict. We have carefully considered issues (3) and (5) and find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987); *see also United States v. Anderson*, 83 M.J. 291, 302 (C.A.A.F. 2023) (holding "[a]ppellant did not have a right to a

---

[1] There are seven specifications each under Charge I and Additional Charge I.

[2] There is one specification each under Charge II and Additional Charge II.

[3] All references to the UCMJ, the Rules for Courts-Martial, and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

[4] The exhibits contained surveillance video as discussed *infra*.

unanimous verdict at his court-martial under the Sixth Amendment, Fifth Amendment due process, or Fifth Amendment equal protection"[5]).

Finding no error that materially prejudiced a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

On four days between 21 May 2019 and 14 June 2019, Appellant made 14 different fraudulent transactions at the Naval Exchange (NEX) in Little Creek, Virginia. In total, Appellant purchased over $16,000.00 of third-party gift cards and high-value merchandise, using stolen credit card information from 11 different credit card holders.

The scheme began in May 2019, after Appellant's boyfriend AA and his friend CH put Appellant in contact with AP, a former military member, who they said could help Appellant make money by using her military status to purchase gift cards and electronics for AP at the NEX.[6] The evidence presented at trial showed Appellant received fraudulent prepaid debit cards from AP that contained stolen credit card account information on the magnetic strip, but did not contain a security chip. Appellant used these cards at the NEX multiple times before the credit card companies flagged the cards for fraud and denied transactions. The evidence showed that Appellant typically went to multiple different registers, making a few transactions at each register on the same day.

Appellant subsequently provided the gift cards and merchandise to AP after she purchased the items. In exchange for her efforts, AP paid Appellant with gift cards or with a portion of the sale proceeds if the merchandise was later sold. On the advice of AP, Appellant then took the gift cards to various grocery stores in the area and used the gift cards to purchase money orders. Documentary evidence admitted at trial showed Appellant typically purchased $500.00 money orders with $500.00 gift cards, and that most of the money orders were made payable to Appellant and deposited in her personal bank account. Other money orders were made out to AP or AA.

---

[5] U.S. CONST. amends. V, VI.

[6] Evidence introduced during trial detailed that in 2015 AP was detained by the loss prevention personnel at the NEX in Norfolk, Virginia, for attempting to purchase items using stolen credit card information. Additionally, the Government produced evidence that AP was subsequently convicted at a special court-martial for conspiracy and larceny which were related to fraudulent credit card purchases at the NEX. Also included in this evidence was information detailing that AP had converted some of his fraudulent purchases into money orders made payable to himself.

A few days after the transactions, the credit card account holders noticed NEX purchases on their statements that they did not authorize and reported the unauthorized use to their credit card companies. In response, representatives from the various credit card companies notified the NEX sales audit team of the fraudulent purchases who in-turn notified Mr. BB, the NEX loss prevention (LP) officer. As a result, Mr. BB opened a formal investigation and testified about the results of his investigation. Mr. BB's investigation revealed that Appellant mainly bought gift cards and electronics at the NEX with the debit cards that contained stolen credit card information. The Government presented evidence that Appellant specifically purchased, *inter alia*, approximately 22 gift cards, two laptop computers, a tablet computer, and a computer video game console.

Mr. BB testified at Appellant's trial that the NEX was liable for any fraudulent charges an individual disputed on their credit card, not the credit card company, because the NEX did not have credit card chip readers installed. Mr. BB testified that he used LP software to track all of the suspected fraudulent transactions made at the NEX. He explained the software provided him with a transaction snapshot for each suspected fraudulent transaction that showed the NEX register where the items were purchased, the cost of each item, and the credit card account numbers associated with the purchases. He also stated that he used video surveillance footage from the NEX registers to connect Appellant to the purchases. Finally, Mr. BB stated that he used a third computer system to determine where gift cards purchased at the NEX were eventually spent. The video and documentary evidence collected by Mr. BB was admitted at trial.

## II. DISCUSSION

### A. Mil. R. Evid. 404(b), *Crimes, Wrongs, or Other Acts*

Appellant argues that the military judge abused his discretion by allowing the Government to introduce evidence under Mil. R. Evid. 404(b) that Appellant engaged in a layered conspiracy with AA and CH to commit the offense of fraudulent use of access devices.[7] Appellant asserts prejudice because the Government was later permitted to use the evidence during argument. Appellant asks that we set aside the findings and sentence. We find the military judge did not abuse his discretion and that no relief is warranted.

### 1. Additional Background

---

[7] Appellant does not allege the military judge erred in allowing similar evidence relating to AP.

On three separate occasions, the Government gave written notice to Appellant that it intended to offer evidence under Mil. R. Evid. 404(b) in her court-martial. The Government generally gave notice that Appellant had engaged in a conspiracy with AP, AA, and CH to commit larceny and fraud. The specific evidence the Government sought to admit included evidence that on 25 May 2019 and 14 June 2019, Appellant used fraudulently obtained gift cards from the NEX to obtain money orders made payable to herself and AA. Additionally, the Government sought to introduce evidence that Appellant and CH used the same stolen credit card number within 25 minutes of each other to purchase identical items at the NEX—two $500.00 gift cards each. The evidence also showed that on a different day Appellant purchased an Apple MacBook Pro while CH is seen on video surveillance standing behind Appellant in line at the NEX.

Finally, the Government sought to introduce evidence that on 25 May 2019, AA and CH were detained by LP personnel at the NEX for fraudulently using stolen credit card information to obtain gift cards, cologne, and electronic devices in separate purchases. This evidence also showed Appellant called the LP office on three occasions, and subsequently physically came to the LP office, while AA and CH were detained, and asked LP personnel questions regarding their detention.

In response to the Government's notices, Defense filed several motions in limine with the military judge to exclude this evidence under Mil. R. Evid. 404(b). Appellant, through her trial defense counsel, objected to the admission of this evidence for three reasons: (1) the Mil. R. Evid. 404(b) notice included evidence of incidents that occurred after the charged offenses; (2) there was "no evidence that [Appellant] was involved, knew of, planned, or acted in conjunction with [AA] or [CH]" except to give AA "a ride home on the day he was stopped and questioned;" and (3) Appellant was not facing a conspiracy charge at her court-martial.

In its response, the Government laid out that the evidence would be used to support the underlying facts of the misconduct which included: records from the NEX's internal computer system showing transactions as suspected fraud; a stipulation of expected testimony from Mr. BB stating Appellant was observed to be working in concert with AA and CH; transaction data from every item alleged to have been charged on the fraudulent accounts; and testimony about Appellant contacting Mr. BB after AA and CH were detained, inquiring about the reasons for their detainment. Trial counsel argued the evidence demonstrated that Appellant "entered into a conspiracy with [AA] and [CH]," and was admissible pursuant to Mil. R. Evid. 404(b) for showing "intent, plan, motive, knowledge, absence of mistake, and . . . consciousness of guilt by" Appellant.

A motions hearing was held before the military judge addressing the Government's requests to present Mil. R. Evid. 404(b) evidence at Appellant's court-martial and Appellant's response to exclude this evidence. At the motions hearing, and on behalf of the Government, Mr. BB testified to his observations of Appellant, AA, and CH engaging in the acts described in the Government's notices. The military judge made the following findings of fact.[8]

First, the military judge found that on 25 May 2019 and 14 June 2019, Appellant allegedly fraudulently obtained gift cards from NEX stores in the Norfolk, Virginia area traceable to money orders paid to Appellant and paid to AA. The money orders listed a shared address for Appellant and AA. Second, that within 25 minutes of each other, Appellant and CH used the same stolen credit card number at the NEX, and purchased identical items of two $500.00 gift cards for an identical total purchase for $1,009.90 on 25 May 2019. Third, On 14 June 2019, Appellant fraudulently purchased an Apple MacBook Pro using stolen credit card information while an individual identified as CH stood behind Appellant.

The military judge also found that AA, CH, and a third unidentified individual were observed arriving at the NEX on 25 June 2019. AA and CH each fraudulently used credit card information, in separate purchases, to obtain electronics, gift cards, and cologne. AA and CH were detained trying to leave the NEX, and while they were detained Appellant called Mr. BB to ask about AA and CH, and how long they would be in the LP office. Appellant was identified by the caller identification function of Mr. BB's work phone. Appellant called the LP office two more times, but eventually went to the LP office. Appellant later stated to another Airman that she got "caught" because the LP officer knew she was tied to AA and CH.

The military judge denied the Defense's motion and allowed evidence involving AA and CH. The Government was permitted to present the noticed evidence under Mil. R. Evid. 404(b) "to show intent, plan, motive, knowledge, absence of mistake, and consciousness of guilt." Further, the military judge found that the evidence had a "weighty" probative value and the evidence involving AA and CH was "not substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or cumulativeness." The military judge stated that any prejudice could be mitigated with a limiting instruction.

The military judge gave the members the following instructions for using evidence of a conspiracy:

---

[8] The facts are contained within the military judge's 13 April 2021 ruling.

If you are convinced by a preponderance of the evidence that a conspiracy to commit larceny existed, you may consider evidence that [Appellant] may have engaged in a conspiracy with [AA], [AP], and [CH] for the limited purpose of its tendency, if any to: (1) Prove a plan or design of [Appellant] to commit larceny; (2) Prove knowledge on the part of [Appellant] that she used an access device, that is a [bank] account, without the authorization of a person whose authorization was required for such use; (3) Prove that [Appellant] intended to defraud the Navy Exchange Services Command through false pretense; (4) Show [Appellant]'s awareness of her guilt of the offenses charged; (5) Determine whether [Appellant] had a motive to commit the offenses; and; (6) Rebut the contention of [Appellant] that her participation in the offenses charged was the result of ignorance or mistake. You may not consider this evidence for any other purpose, and you may not conclude from this evidence that the accused is a bad person or has general criminal tendencies and that she therefore committed the offenses charged. A "preponderance of the evidence" means, the allegation is more likely true than not true.

**2. Law**

We review a military judge's decision to exclude evidence for abuse of discretion. *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F. 2004) (citation omitted). An abuse of discretion occurs when the findings of fact are clearly erroneous or the conclusions of law are based on an erroneous view of the law. *United States v. Hollis*, 57 M.J. 74, 79 (C.A.A.F. 2002) (citation omitted). We thus "review findings of fact under the clearly erroneous standard and conclusions of law de novo." *United States v. Cote*, 72 M.J. 41, 44 (C.A.A.F. 2013) (citation omitted).

"The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and [a military judge's decision] will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted).

If proffered evidence has any tendency to make a fact of consequence more or less probable, then the evidence is relevant. Mil. R. Evid. 401. Absent a rule requiring otherwise, relevant evidence is admissible. Mil. R. Evid. 402. Even when evidence is relevant, a military judge may prohibit its admission when

the evidence's probative value is substantially outweighed by such considerations as the dangers of unfair prejudice, confusing the issues, and wasting time. Mil. R. Evid. 403. Military judges have "wide discretion" in applying the Mil. R. Evid. 403 balancing test; however, military judges are afforded less deference when they do not explain their analysis on the record, and we give them no deference when they do not conduct the analysis at all. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000).

Mil. R. Evid. 404(b)(1) provides that evidence of a crime, wrong, or other act by a person is not admissible as evidence of a person's character in order to show the person acted in conformity with that character on a particular occasion and cannot be used to show predisposition toward crime or criminal character. However, such evidence may be admissible for another purpose, including to show, *inter alia*, motive, intent, plan, absence of mistake, or lack of accident. Mil. R. Evid. 404(b)(2); *United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010) (citation omitted). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A. 1989) (footnote omitted).

On the question of admissibility of an appellant's uncharged misconduct under Mil. R. Evid. 404(b), we use the following three-part test: (1) Does the evidence reasonably support a finding by the factfinder that the appellant committed other crimes, wrongs, or acts? (2) Does the evidence of the other act make a fact of consequence to the instant offense more or less probable? (3) Is the probative value of the evidence of the other act substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403? *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989) (citations omitted). "If the evidence fails to meet any one of these three standards, it is inadmissible." *Id*.

### 3. Analysis

We begin our analysis by noting that neither party disputes the military judge's findings of fact, and we find that the military judge's findings of fact are supported by the record. Our review of the military judge's ruling also supports the conclusion that the military judge used the correct law and legal framework to analyze the issues. Turning our attention to the question of whether the military judge's conclusions of law were based on an erroneous application of the law, we find the military judge's conclusions of law were not arbitrary, fanciful, clearly unreasonable, or clearly erroneous.

Appellant argues on appeal that the military judge incorrectly analyzed the proffered evidence under the *Reynolds* test. Specifically, Appellant takes issue with the military judge's conclusions on the first and third prongs which she contends were not supported by the facts or evidence.

The first prong of the *Reynolds* test simply requires the proponent to offer some evidence that the alleged prior acts actually occurred. Here, we find sufficient evidence in the record to support the conclusion that Appellant was engaged in a conspiracy with AA and CH to commit both fraud and larceny. This conclusion is supported in the record by both documentary evidence, and more specifically, through the direct testimony of Mr. BB.

Appellant does not contest the military judge's conclusions on the second prong. We find the military judge's conclusion on the second prong to be supported by the record. Here, the proffered evidence speaks directly on the issue of Appellant's knowledge, intent, lack of mistake, and consciousness of guilt.

Finally, as to the third prong, we again find the military judge's conclusion that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403 to be well reasoned. As explained above, the military judge found the evidence to be highly probative and found nothing particularly inflammatory about Appellant's collusions with her co-actors. Contrary to Appellant's assertion, we do not find the evidence to be "prejudicial" or "inflammatory." Here, the evidence was simply the case facts necessary to give the factfinder a full understanding of what transpired. We also find admission of this evidence did not create a risk that the members would decide the case on an emotional or other improper basis, especially in light of the limiting instruction the military judge provided to the members on this evidence. *See United States v. Tyndale*, 56 M.J. 209, 216 (C.A.A.F. 2001) ("Court members are presumed to follow the military judge's instructions." (citing *United States v. Holt,* 33 M.J. 400, 408 (C.M.A. 1991)). The military judge did not abuse his discretion in finding the evidence met the third prong.

We conclude that the military judge did not abuse his discretion in allowing the proffered evidence in this case. The military judge's findings of fact were supported by the record and therefore were not clearly erroneous. Furthermore, we find the military judge applied the correct law and placed his findings and conclusions in writing. Finally, recognizing that the military judge had a range of choices, we find his decision to allow evidence tending to show Appellant was engaged in a conspiracy was within the range of reasonable choices and therefore not "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *White*, 69 M.J. at 239.

## B. Legal and Factual Sufficiency

On appeal, Appellant contends her convictions for fraudulent use of a credit card, debit card, or other access device, and larceny are legally and factually insufficient. Specifically, Appellant argues the Government failed to prove the specific intent element for both sets of offenses. Appellant requests that we set aside the findings and sentence. We disagree and find no relief warranted.

### 1. Additional Background

At trial Appellant testified in her own defense. During her testimony she explained that she was dating AA in May 2019 and they had a child together. She stated AA told her that he knew someone, AP, who would pay her to go to the NEX and purchase things. She initially ignored the suggestion from AA, but later reconsidered after she was approached by CH, who also stated his friend AP would pay her to purchase gift cards and computers from the NEX. Subsequently, Appellant asked AA to arrange a meeting between her and AP.

On 21 May 2019, Appellant met with AP in a parking lot near Little Creek Naval Base. During the meeting, AP asked Appellant to purchase items for him at the NEX with prepaid debit cards. The items she purchased that day included gift cards, video game consoles, and computer products. After she made the purchases, she gave the merchandise to AP, and AP gave her approximately $1,500.00 in gift cards for her efforts. According to Appellant, AP told her she would receive a portion of the sale price if she could help sell the computer products. Appellant then took the gift cards to a grocery store, converted the gift cards into a money order, and deposited the money order funds into her bank account.

Four days later Appellant met with AP and again made purchases—mainly gift cards and electronics—at the NEX with prepaid debit cards. Appellant remembered AA was also with her this time. She explained that she would use the debit cards until they were declined, and then she would use another of the cards that AP had given her. In Appellant's words at trial:

> Okay. So for example, on May 25th I would go in there, I would purchase the Apple product. After purchasing the Apple product, if I needed to use both cards, and one of them declined I would just keep track of which one declined, and then I would return to the car, give [AP] the products and I would tell him, "Okay. This card declined." So he would take the card that declined. And I could continue to use the card that did not decline. And then sometimes he would give me another card and say, "Here. Use this one, instead." He'd give me another card, and then asked me do I want to go in there and purchase these items now. And each time I went in and purchased something I would get paid for it. So I didn't mind.

Appellant confirmed she was paid "a thousand dollars" in gift cards by AP on 25 May 2019 and 14 June 2019, which she exchanged for money orders and deposited into her bank account.

Appellant testified she never thought she was doing anything wrong and she had no idea the prepaid debit cards which she used to make the NEX purchases had stolen credit card accounts associated with them. On cross-examination by trial counsel, Appellant explained:

Q. And you told us you didn't think this was suspicious what you were doing, correct?

A. Yes, sir.

Q. So when you meet a guy that you don't know for the first time in a parking lot at Little Creek, you don't think that's suspicious, correct?

A. No, sir, since it was someone that I was in a relationship with introducing me to him and like -- I don't know the right term but like, based off of [AA] asking me and his whatever he had with [AP], that's why I was just like okay, you're a friend of my significant other's -- or you're a person he knows. So I'm fine with meeting you.

Q. So you didn't think it was suspicious when you're meeting a guy you don't know, in a parking lot, down at Little Creek, to go make some purchases on base?

A. No. And he also couldn't get on base, so it's not like we could have met at the parking lot in the NEX or anything like that. So that's why it was in the parking lot across the street from Little Creek, because he couldn't get on the base.

Q. And you didn't think it was suspicious when this guy you don't know asks you to go and buy $1,400[.00] worth of gift cards and [e]lectronics at [a store], on May 21st, correct?

A. Yes, sir.

Q. And you didn't think it was suspicious when four days later he asked you to go and buy -- we'll call it $3,000[.00] worth of gift cards and -- we'll start -- $3,000[.00] gift cards on May 25th, correct?

A. Yes, sir.

Q. Yes, you thought it was suspicious or no, you didn't think it was suspicious?

A. No, I didn't think it was suspicious.

Q. Okay. You didn't think it was suspicious when four days later, on May 29th, he asked you to go back to the exact same store and buy a $1,100[.00] iPad. Correct?

A. Correct.

Q. You didn't think it was suspicious, on June 14th, when he asked you to go to the [NEX] and purchase $4,000[.00] worth of gift cards, correct?

A. Correct.

Q. You didn't [think] it was suspicious when he asked you to buy a $2,639[.00] Apple Mac Pro [sic] on that same day, correct?

A. Correct.

Q. And you didn't think it was suspicious when, in the course of all of that, he's giving you thousands of dollars for making purchases, correct?

A. Correct.

### 2. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, the "standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (internal quotation marks and citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Unites States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

"The test for factual sufficiency 'is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399) *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *Wheeler*, 76 M.J. at 568 (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)). This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. *See* Article 66(d), UCMJ, 10 U.S.C. § 866(d); *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

Appellant was convicted of 14 specifications of fraudulent use of a credit card, debit card, or other access device, in violation of Article 121a, UCMJ, which required the Government to prove three elements beyond a reasonable doubt: (1) Appellant knowingly used an access device "without the authorization of a person whose authorization was required for each use;" (2) "the use was to obtain money, property, services, or anything else of value;" and (3) "the use by [Appellant] was with the intent to defraud." *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 65.b.(1), (3)–(5).

Article 121a, UCMJ, requires specific intent to defraud which is defined as "an intent to obtain, through a misrepresentation, an article or thing of value and to apply it to one's own use and benefit or to the use and benefit of another, either permanently or temporarily." *MCM,* pt. IV ¶ 70.c.(14). "[I]ntent to defraud may be proved by circumstantial evidence." *MCM,* pt. IV ¶ 65.c.(3).

Access device as applied to Article 121a, UCMJ, is defined as:

> any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).

18 U.S.C. § 1029.[9]

Appellant was also convicted of two specifications of larceny, in violation of Article 121, UCMJ, which required the Government to prove four elements beyond a reasonable doubt: (1) "[Appellant] wrongfully took, obtained, or withheld certain property from the possession of the owner or of any other person;" (2) "the property belonged to a certain person;" (3) "the property was of a certain value, or of some value; and" (4) "the taking, obtaining, or withholding by [Appellant] was with the intent permanently to deprive or defraud another person of the use and benefit of the property or permanently to appropriate the property for the use of the accused or any other person other than the owner." *MCM*, pt. IV, ¶ 64.b.(1)(a)–(d). Article 121, UCMJ, states:

> The offense of larceny requires that the taking, obtaining, or withholding by the thief be accompanied by an intent permanently to deprive or defraud another of the use and benefit of property or permanently to appropriate the property to the thief's own use or the use of any person other than the owner.

*MCM*, pt. IV, ¶ 64.c.(1)(f)(i). The *MCM* goes on to explain: "An intent to steal may be proved by circumstantial evidence." *MCM*, pt. IV ¶ 64.c.(1)(f)(ii).

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." R.C.M. 916(j)(1). "If the ignorance or mistake goes to an element requiring premeditation, specific intent, willfulness, or knowledge of a particular fact, the ignorance or mistake need only have existed in the mind of the accused." *Id.* It is the Government's burden to prove beyond a reasonable doubt that the defense did not exist. R.C.M. 916(b)(1).

### 3. Analysis

#### a. Fraudulent Use of an Access Device

As to Appellant's fraudulent use of an access device, such as a debit card or credit card, we find the Government presented sufficient circumstantial evidence for a rational trier of fact to determine that Appellant possessed the required intent to defraud. In assessing legal sufficiency, we are limited to the evidence produced at trial and required to consider it in the light most favorable to the Prosecution. We note the bulk of the evidence produced at trial was free from conflict and included Appellant's own testimony.

---

[9] Article 121a, UCMJ, states that "the term 'access device' has the meaning given that term in section 1029 of title 18." *MCM*, pt. IV ¶ 65.a.(b).

Appellant essentially asserts that no rational trier of fact could conclude she intended to defraud because her self-serving testimony indicates otherwise. We reject this assertion. The evidence presented at trial established Appellant used prepaid debit cards containing stolen credit card information—namely stolen account numbers from 11 separate individuals that she did not know—and misrepresented the stolen credit card information as legitimate prepaid debit cards when she swiped the cards at the NEX registers. Appellant then misrepresented the nature of the access device, using the fraudulent debit cards to obtain gift cards and other merchandise worth over $16,000.00. The evidence also showed she benefitted from these transactions, in that she was compensated in gift cards she fraudulently purchased. Considering the facts in the light most favorable to the Government, we find a rational trier of fact could have found that Appellant's actions demonstrated her "intent to obtain, through a misrepresentation" gift cards and other merchandise and "to apply it to [her] own use and benefit or to the use and benefit of another, either permanently or temporarily." *MCM,* pt. IV, ¶ 70.c.(14).

In her appeal, as she did at trial, Appellant raises seven arguments and generally contends that certain facts were overlooked by the members at her trial. She argues these facts negate any criminal intent she had to defraud the 11 individuals. The majority of her arguments stem from her own testimony at trial, where she stated she had a mistaken belief that the debit cards were legitimate, and she did not believe she was doing anything illegal. We need not discuss each argument individually as we recognize the standard for legal sufficiency "gives full play to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the basic facts to ultimate facts." *Oliver*, 70 M.J. at 68 (internal quotation marks omitted) (quoting *Jackson*, 443 U.S. at 319). Here, the members were free to discount and disbelieve Appellant's testimony in reaching their ultimate findings. We find that there was sufficient circumstantial evidence presented to reach the conclusion that Appellant knew her actions were illegal and therefore possessed the required intent to defraud. We further find the same circumstantial evidence was sufficient for the Government to meet its burden to prove that Appellant did not have a mistake of fact as to her criminal behavior.

Appellant also contends that Specification 5 of Charge I (alleging fraudulent use of an access device) is legally insufficient because KT, the named victim, did not testify. We disagree. The Government presented a business record of the disputed charge at trial that sufficiently established KT did not authorize the transaction in question. Furthermore, we do not find Appellant's right to confrontation was violated because the evidence presented by the Government was non-testimonial as it was not made in anticipation of trial. *See United States v. Goldstein*, 442 F.3d 777, 785 (2d Cir. 2006) (explaining documentary evidence of a disputed charge is non-testimonial because it was not

made in anticipation of trial and, therefore, not subject to the confrontation clause).

### b. Larceny

As to Appellant's larceny convictions, we find the Government presented sufficient circumstantial evidence for a rational trier of fact to determine Appellant possessed the required specific intent. Having already discussed Appellant's intent to defraud, we focus our analysis here on Appellant's contention the Government failed to prove that she had the specific intent to deprive the NEX of its use of the property she purchased. Again, we disagree with Appellant's contention.

Here the Government presented uncontested evidence that Appellant took electronics and gift cards from the NEX by using stolen credit card information on what appeared to be legitimate gift cards; moreover, she did not return the items she purchased, but instead deposited the proceeds into her bank account through a multi-step process of converting some of the stolen merchandise into money orders. Additionally, she gave the remaining merchandise to AP, who she understood by her own admission was not going to return the items to the NEX. The evidence also established that the NEX suffered pecuniary harm as a result of the lost merchandise purchased by Appellant since the NEX was responsible for refunding the individuals who had their credit card information stolen as part of Appellant's fraudulent purchases at the NEX.

We conclude that, viewing the evidence introduced at trial in the light most favorable to the Prosecution, a rational trier of fact could have found the essential elements of the crimes of fraudulent use of a credit card, debit card, or access device and larceny beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297−98. Furthermore, after weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41.

## C. Post-Trial Delay

Appellant contends she is entitled to relief for an unreasonable post-trial delay. Specifically, Appellant argues that 643 days had elapsed between the announcement of sentence and the date the completed record of trial was docketed with this court after our remand. Appellant asks we grant sentencing relief and only approve so much of the sentence that calls for reduction to the grade of E-2 and an $8,000.00 fine. We disagree and find no relief is warranted.

### 1. Additional Background

Appellant was sentenced on 21 April 2021. Appellant's case was docketed with this court on 17 September 2021. Between her sentence and docketing

with this court, 149 days elapsed. After this case was docketed, Appellant requested 13 enlargements of time, and all but 3 were opposed by the Government. Appellate defense counsel notified appellate government counsel in mid-September 2022, approximately 363 days since docketing, that he did not possess the software to watch the NEX surveillance videos that were identified in the record of trial as prosecution exhibits. The Government tried to assist with a solution. Subsequently, on 4 October 2022, appellate defense counsel notified this court that he was unable to view 13 prosecution exhibits with the software available to him on a government computer, and 382 days had elapsed since docketing. As a result, this court remanded this case for correction on 7 December 2022, 446 days since docketing.

Technical Sergeant (TSgt) CW, the noncommissioned officer in charge of the military justice section of the office of the staff judge advocate at Joint Base Langley-Eustis, Virginia, provided a declaration explaining the steps his office took to remedy the unviewable prosecution exhibits after the case was remanded. The declaration explains that on 13 December 2022, his office was notified that the 13 prosecution exhibits needed to be converted to a readable file format. Two paralegals from the legal office determined the exhibits on the original discs were unreadable on Air Force computers. On 14 December 2022, the legal office engaged with communications experts on base, but they were unable to read the files using software they possessed. TSgt CW contacted the NEX the same day and on 19 December 2022, met with NEX personnel to use the NEX's standalone computer which was installed with the software necessary to view the exhibits.

On 19 December 2022 from 0900 hours to 2330 hours, TSgt CW used the NEX's computer to screen record the exhibits and he sent copies of the videos to the trial defense counsel of record for review on 20 December 2022. The same day, trial defense counsel stated he reviewed the exhibits and had no objections. The court reporter prepared the certificate of correction on 27 December 2022. When the court reporter prepared the certificate of correction, she added signature blocks for the military judge, circuit trial counsel, trial defense counsel, and Appellant. However, in her email to the military judge she pointed out only the court reporter's and military judge's signatures were necessary. Another paralegal sent circuit trial counsel the certificate of correction on 27 December 2022, and circuit trial counsel returned it on 28 December 2022. TSgt CW sent the certificate of correction to trial defense counsel on 28 December 2022. Trial defense counsel returned the certificate of correction to the legal office on 4 January 2023, but he explained he could not reach Appellant for her review and signature. On 24 January 2023, this case was re-docketed with our court, 48 days after remand and 494 days after initial docketing. From the initial docketing date of 17 September 2021 over 18 months had elapsed.

**2. Law**

"This court reviews de novo whether an appellant's due process rights are violated because of post-trial delay." *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

*Moreno* outlined thresholds for facially unreasonable delay during three portions of the post-trial and appellate process. 63 M.J at 141–43. *Moreno* established a presumption of facially unreasonable delay where: (1) the convening authority did not take action within 120 days of the completion of trial, (2) the record was not docketed with the Court of Criminal Appeals within 30 days of the convening authority's action, or (3) the Court of Criminal Appeals did not render a decision within 18 months of docketing. *Id.* at 142.

In *Livak*, this court explained that "[d]epending on the length and complexity of the record involved, we can envision cases in which the court reporter is still transcribing the proceedings after the convening authority's decision." 80 M.J. at 633. "As such, the prior 30-day period from action to docketing, which primarily involved transmitting an already-completed [record of trial] to the Court of Criminal Appeals, now overlays substantive actions such as completing the preparation of the record." *Id.* Therefore, "the specific requirement in *Moreno* which called for docketing to occur within 30 days of action no longer helps us determine an unreasonable delay under the new procedural rules." *Id.*

This court ultimately decided, consistent with the United States Court of Appeals for the Armed Forces (CAAF) threshold for facially unreasonable delay established by *Moreno*, we can apply the aggregate *Moreno* standard of 150 days from the day an appellant was sentenced to docketing with this court, to determine whether an appellant's case has been subject to a facially unreasonable delay. *Id. Livak* concluded the "150-day threshold appropriately protects an appellant's due process right to timely post-trial and appellate review and is consistent with our superior court's holding in *Moreno*." *Id.*

If there is facially unreasonable post-trial delay, we apply a four-factor test to determine what relief, if any, an appellant should receive: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of her right to a timely review; and (4) prejudice to the appellant. *Moreno,* 63 M.J. at 138–40 (citations omitted).

The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present

a defense at a rehearing. *Id.* (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Even in the absence of a due process violation, this court still considers whether relief for excessive post-trial delay is warranted consistent with this court's authority under Article 66(d), UCMJ. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002); *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016).

This court considers the following factors relevant in considering whether *Tardif* relief is appropriate:

> (1) How long did the delay exceed the standards set forth in [*Moreno*]; (2) What reasons, if any, has the [G]overnment set forth for the delay? Is there any evidence of bad faith or gross indifference to the overall post-trial processing of this case?; (3) Keeping in mind that our goal under *Tardif* is not to analyze for prejudice, is there nonetheless some evidence of harm (either to the appellant or institutionally) caused by the delay?; (4) Has the delay lessened the disciplinary effect of any particular aspect of the sentence, and is relief consistent with the dual goals of justice and good order and discipline?; (5) Is there any evidence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation?; and (6) Given the passage of time, can this court provide meaningful relief in this particular situation?

*Gay*, 74 M.J. at 744.

### 3. Analysis

We decline, as Appellant suggests, to find that over 600 days had elapsed between announcement of the sentence and docketing of her case with this court. Here, the record establishes that Appellant's case was docketed at 149 days, which is one day under the 150-day *Livak* threshold. Therefore, we conclude that there was not a facially unreasonable delay in post-trial processing.

That said, we recognize that as of today's date, over 18 months have elapsed since Appellant's record of trial was originally docketed with this court. Assuming for purposes of our analysis that the 7 December 2022 remand and 24 January 2023 re-docketing of the record did not "reset" the *Moreno* timeline, there is a facially unreasonable delay in the appellate proceedings. Accordingly, we have considered the *Barker* factors and find no violation of Appel-

lant's due process rights. Appellant has not specifically alleged cognizable prejudice, and we find none. In particular, Appellant was not sentenced to any confinement, has not expressed any particularized anxiety or concerns, and we have found no material prejudice to Appellant's substantial rights and affirm her sentence.

Furthermore, we find the delays involved in Appellant's case have not been so egregious as to adversely affect the perception of the military justice system. Other than a relatively brief remand of approximately six weeks to ensure a complete record, the delays are largely the result of Appellant's requests for enlargements of time. Accordingly, we find no violation of Appellant's due process rights. Likewise, recognizing our authority under Article 66(d), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *Gay*, 74 M.J. at 742, we conclude no such relief is warranted.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court